Scott Krauss News Agency, Inc. v. Commissioner.
Scott Krauss News Agency, Inc. v. Commissioner
Docket No. 94614.
United States Tax Court
T.C. Memo 1964-171; 1964 Tax Ct. Memo LEXIS 168; 23 T.C.M. (CCH) 1007; T.C.M. (RIA) 64171; June 19, 1964
William W. Ellis, Jr., and James O. Seymour, for petitioner. John J. Larkin, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal year ended June 30, 1959, in the amount of $14,961.10. The issues for decision are: (1) Whether a year-end adjustment made by petitioner for magazines delivered by it to dealers prior to the close of the year, but returned to it for a credit allowance after the close of the year is proper and, if not, should a comparable adjustment, made for the year for magazines returned by dealers during the year which represent magazines delivered to the dealers by petitioner's predecessor partnership in the preceding year, be reversed; and (2) Whether petitioner claimed *169 an excessive deduction for compensation for services rendered by Venus Krauss during the taxable year. Findings of Fact Some of the facts have been stipulated and are found accordingly. Scott Krauss News Agency, Inc., hereinafter referred to as petitioner, is an Ohio corporation with its principal office located at 1180 West Goodale Boulevard, Grandview Heights, Ohio. Its return for the fiscal year ended June 30, 1959, was filed with the district director at Columbus, Ohio. Petitioner's books were kept and its tax return prepared on an accrual method of accounting. Petitioner is engaged in the business of distributing magazines and similar type publications in and around Columbus, Ohio. Prior to the incorporation of petitioner, the business had been operated as a partnership consisting of Scott Krauss, his wife Venus Krauss, and Lowell Frost. On July 1, 1958, the partnership's assets and liabilities were transferred to petitioner in a tax-free exchange pursuant to section 351 of the Internal Revenue Code of 1954. In exchange for the property transferred, Scott Krauss received 765 shares of the common stock of petitioner; Venus Krauss, 742 1/2 shares; *170 and Lowell Frost, 742 1/2 shares. Petitioner's operations consist of the acquisition of a large volume of numerous publications from magazine publishers and national distributors and the distribution of such publications to news dealers, such as drugstores, grocery stores, and newsstands, for sale to the public. Petitioner handles approximately 800 different publications and distributes magazines to more than 520 newsdealers, located within a 50-mile radius of Columbus, Ohio. Year-End Adjustment Issue Petitioner's contracts with the publishers (publishers include national distributors) provide generally that petitioner must pay by the middle part of the month for all magazines billed by the publishers to petitioner during the preceding month and that petitioner is entitled to a corresponding offset or credit from the publishers for all magazines which remain unsold after distribution to the dealers and are returned by petitioner to the publishers. Petitioner's contracts with most of its dealers provide in part as follows: The undersigned hereby certifies that the articles of tangible personal property purchased from the… [petitioner] after… shall be purchased: To resell *171 the thing transferred in the form in which the same is, or is to be, received. * * *
Please deliver magazines on your regular deliveries to me at the address below. I AGREE TO PAY MY ACCOUNT IN FULL EACH WEEK. * * * This is to certify that any and all Magazines, Periodicals, etc., which I receive for sale from the…, [petitioner],…, remain the property of said Company [petitioner] until I have settled for same, and that I receive same from said Company solely on a consignment basis, for sale in the usual course of trade. It is understood that any magazines, etc., which are not sold, in the usual course of trade, are fully returnable by me for full credit. * * *
Petitioner delivers about 350,000 magazines a week to the dealers. Approximately 60 percent of the magazines delivered to the dealers are sold at retail and the remaining 40 percent are returned to petitioner for credit. The demand by the public for certain publications may vary from issue to issue due to season, weather, or psychological reaction. The contracts between petitioner and the publishers provide that magazines may not be withdrawn from sale prior to the "off sale" date and that petitioner *172 must return the unsold magazines or all or part of the front covers of the unsold magazines to the publisher within a 30 to 60-day period following the "off sale" date in order for petitioner to receive credit from the publisher. Some of the contracts provide further that when only the cover or a part thereof is returned to the publisher for credit, the remaining part of the magazine must be mutilated so as to render it unsalable as a publication. The length of time that publications remain on the newsdealers' racks varies. The weekly magazines remain for 7 days; the bi-weeklies, for 14 days; the monthlies, for 30 days; and the so-called "one shot" issues remain out for an indefinite period of time. Petitioner's route men pick up the unsold old magazines from the newsdealers when the new magazines are delivered. Petitioner maintains with respect to each newsdealer a running account in which are made all charges for magazines delivered to such dealer and all credits for magazines returned by such dealer to petitioner. Such charges and credits are made at the wholesale price for the magazines to the dealer. A statement of such running account is delivered to the dealer each week *173 by petitioner's routemen. At the close of the year ended June 30, 1959, the total unpaid balance for these running accounts was $101,199.88. For its fiscal year ended June 30, 1959, petitioner reported on its tax return total billings, representing magazines delivered to newsdealers during the year at the wholesale price of $3,432,639.34 and sales returns purportedly representing magazines unsold to the public which were returned by the dealers to petitioner during the year at the wholesale price of $1,285,341.17, leaving net sales of $2,147,298.17 from which was subtracted the amount of $1,712,862.41 to arrive at gross profit from sales of $434,435.76. In arriving at the sales returns figure of $1,285,341.17, petitioner adjusted the amount of $1,282,239.70 representing a total of the 12 monthly figures of sales returns by journal entries made at the close of the fiscal year 1959 as follows: (a) The amount of $90,292.77 was subtracted from the total of the sales returns for the 12-month period from July 1, 1958, to June 30, 1959. This amount represented the portion of the July 1958 returns calculated by petitioner to be attributable to publications remaining on dealers' racks unsold *174 to the public as of June 30, 1958. The $90,292.77 amount was calculated as follows: Total returns July 1, through August
4, 1958
$115,759.96
Less: 10 percent to adjust for
weekly and daily publications
11,575.99
$104,183.97
Less: two-thirds of 1 week's average
so that the returns will cover
period of 1 month
13,891.20
$ 90,292.77
(b) The amount of $93,394.24 was added to the total of the sales returns for the 12 month period July 1, 1958 through June 30, 1959. This amount represented the portion of sales returns received in July 1959, which petitioner calculated as attributable to publications which were unsold by the dealers to members of the public on June 30, 1959. The $93,394.24 amount was calculated as follows: Total sales returns from July 1,
through August 3, 1959 [1]
$119,394.32
Less 10% to adjust for weekly and
daily publications
11,939.43
$107,454.89
Less 2/3 of 1 week's average so that
the sales returns will cover a
period of 1 month
14,060.65
$ 93,394.24
The net result of the two above adjustments *175 to total sales returns for the year is as follows: Gross sales returns for year ended
June 30, 1959
$1,282,239.70
Less: July 1958 sales
returns adjustment
($90,292.77)
Plus: July 1959 sales
returns adjustment
93,394.24
3,101.47
3,101.47
Adjusted sales returns as reported
on the return
$1,285,341.17
The adjustments with respect to July 1958 sales returns were made by the following entries on page J 16 of petitioner's journal under date of June 28, 1959: Dr.
Cr.
Sales Return Reserve
$17,002.13
Purchase Returns
73,290.64
Sales Returns
$90,292.77
The adjustments with respect to June 30, 1959, sales returns were likewise made by the following entries on page J 16 of petitioner's journal under date of June 28, 1959: Dr.
Cr.
Sales or Billings Returns
93,394.24
Purchase Returns
76,022.91
Sales Return Reserve
17,371.33
The purchase returns in the two above sets of entries represent the offsetting credit which petitioner computed it was entitled to receive when the sales returns it receives from the dealers are, in turn, returned by it to the publishers. The sales return reserve, in the *176 two above sets of entries, represents, in effect, petitioner's margin of profit on the magazines between its total computed cost thereof from the publishers and its total computed selling price thereof to the dealers. The net effect of the two above adjustments for petitioner's fiscal year ended June 30, 1959 is to increase sales returns from the dealers by a net amount of $3,101.47, thus decreasing net sales for the year by that amount and decreasing cost of goods sold by $2,732.27 (the net increase of "Purchase Returns") thus resulting in a net decrease in gross profit from sales of $369.20. Petitioner's predecessor partnership for its fiscal year ended June 29, 1958, made closing entries comparable to the July 1958 sales return adjustment made by petitioner. For that year the partnership increased sales returns by $90,292.77 and credited sales return reserve $17,002.13 and purchase returns $73,290.64. The making of this yearend adjustment and also the adjustment decreasing sales for the prior year's adjustment had been a practice followed by the partnership for a number of years prior to its fiscal year 1958. The partnership was on an accrual basis of accounting. It was impractical *177 for petitioner to make an inventory count at the end of each taxable year of the magazines on the dealers' shelves which had not been sold to the public. In the notice of deficiency respondent decreased petitioner's sales returns and allowances by the amount of $93,394.24 and increased merchandise bought for sale by the amount of $76,022.91, thus increasing petitioner's taxable income for its fiscal year ended June 30, 1959 by the amount of $17,371.33. Compensation Issue Venus Krauss, hereinafter referred to as Venus, was the secretary-treasurer of petitioner during the taxable year here in issue. Venus, in pursuance of her duties, maintained an office in her home containing a desk, typewriter, two filing cabinets, and a library comprised of books and publications pertaining to the magazine industry. Venus went to petitioner's offices several times a week. Venus actively participated in the management of petitioner. All major management decisions for petitioner were made by Venus, Scott Krauss, and Lowell Frost, petitioner's vice president. Venus also attended meetings held with A. K. Ulrich, petitioner's auditor, who came to Columbus four times a year to perform services *178 for petitioner. Venus' other activities relative to the corporation included examining bills submitted to it and disbursing corporate funds in payment thereof, engaging in promotional activities, working with labor relations matters, doing research as to truck colors and suggesting the color which was selected and used by petitioner for all its trucks, examining dealer displays, and advising Scott Krauss and Frost concerning personnel policies. Venus spent 4 to 5 hours a day, or 100 to 110 hours a month, in her endeavors on behalf of petitioner. Venus' promotional work consisted of delivering speeches before women's clubs, in which she pointed out the advantages of purchasing magazines from newsstands as opposed to buying magazines through mail subscriptions. Also, Venus reviewed all publications to be distributed and discussed with Scott Krauss and Frost the advisability of distributing any magazines which might be considered not acceptable by the public. When one of petitioner's dealers was arrested under a local ordinance regarding objectionable literature, Venus supplied the attorneys who were working on the case with research material from her library and with other information. *179 Venus handled telephone inquiries and answered complaints from members of the public respecting magazines that petitioner was distributing. Also, Venus recommended that each key employee in petitioner's organization have a well-trained assistant. The proposal was adopted by petitioner. Venus became a partner with Scott Krauss in petitioner's predecessor partnership when she married Scott Krauss, which was some time prior to 1948. In 1948, Frost became a third partner in the business. The partnership return of income for the year ended June 29, 1958, indicates each partner's share of profits of the business was as follows: Scott Krauss
$15,279.53
Venus Krauss
14,830.14
Lowell Frost
14,830.14
Prior to her marriage to Scott Krauss, Venus was for 14 years employed by a department store. Her work with the store included selling merchandise, writing descriptive advertising copy for the store, and traveling to New York City three or four times a year, acting as a buyer. At one point she was merchandise woman for a garment department in the store where she had five girls under her supervision to be trained. Later, she was given complete charge of the ladies ready-to-wear *180 department of the store. For the taxable year, petitioner paid salaries to its officers as follows: Scott Krauss
$24,000.00
Lowell Frost
20,000.00
Venus Krauss
12,000.00
Respondent determined petitioner was entitled to a deduction of $600 as a reasonable allowance for salary to Venus, and disallowed the $11,400 balance of the $12,000 which was paid to her by petitioner and claimed by it as a deduction on its corporate tax return for its fiscal year ended June 30, 1959. Ultimate Fact A reasonable salary for the services rendered by Venus Krauss to petitioner during petitioner's fiscal year ended June 30, 1959, is $12,000. Opinion Year-End Adjustment Issue Petitioner is a wholesale distributor of magazine publications, acquiring magazines from publishers and delivering them to retail dealers operating newsstands, drugstores, and department stores for sale to the public. This distribution is made with the provision that magazines remaining unsold after display to the public for an agreed period may be returned by the dealers to petitioner for full credit and petitioner, in turn, may return the magazines to the publishers, also for full credit. Petitioner *181 also maintained a purchase returns account wherein petitioner recorded magazines returned to it by the dealers, which petitioner returned to the publishers. In the operation of the business petitioner maintained a running account with each dealer wherein magazines delivered were charged and magazines returned were credited. At the end of the year petitioner totaled up the gross charges or gross sales and the sales returns of all the dealers' running accounts, and the total entries to the purchase returns account. Petitioner then made adjusting entries which are explained in our findings. The net effect of all the entries whereby the computed amount of sales returns received in July 1959 were used to reduce income for the taxable year ended June 30, 1959, and the computed sales returns received during July 1958 were used to increase income for that taxable year, is to reduce petitioner's taxable income for the year by the amount of $369.20 as set out in detail in our findings. Respondent in his notice of deficiency reversed petitioner's adjusting entries respecting the July 1959 sales returns, thus increasing petitioner's income in the amount of $17,371.33. Respondent made no change *182 in petitioner's adjustment made in June 1959 but as of the beginning of the fiscal year 1959 whereby sales returns for the first month were used to increase income for the taxable year. Petitioner maintains that it does not sell the magazines to the dealers but rather delivers the magazines to the dealers on consignment for sale to the public. Petitioner contends that the magazines on the dealers' racks at the beginning and end of the fiscal year belong to it and are part of its inventory on hand. It is petitioner's position that since it is not feasible to take a physical inventory, its adjusting entries are a reasonable approximation of its inventory value. Petitioner concedes that if the delivery of the magazines to the dealers is held to constitute sales, it must treat magazines delivered to the dealers as income without diminution for possible future magazine returns. Brown v. Helvering, 291 U.S. 193 (1934). We conclude that the delivery of magazines to the dealers constitutes sales of the magazines to the dealers and not consignments to the dealers for sale to the public. The evidence shows that petitioner sends statements of account to its dealers showing *183 the amount due from the dealers to petitioner. The statements represent the total amount charged to the dealer for magazines delivered to him less credit for magazines returned to petitioner. These statements, petitioner asserts, are sent out weekly to all the dealers and they cover deliveries and returns made during the preceding week. The agreements between petitioner and the dealers provide that the dealers agree to pay their accounts in full each week. It is the right to receive and not the actual receipt that determines the inclusion of an amount in gross income of an accrual basis taxpayer. When the right to receive an amount becomes fixed, the right accrues. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). It is clear that when the magazines are delivered to the dealers, petitioner is entitled to the contract price from the dealers. The contract price for the magazines accrues at that time. All that remains to be done is for petitioner to bill the dealers for the magazines delivered. The contracts stipulate that the magazines "purchased" by the dealers are purchased for resale. The contracts also provide that title in the magazines remains with *184 petitioner until the dealer has "settled for same." However, as pointed out above, the dealers, under the contracts, are obligated to pay their accounts in full each week. The sale is consummated when the magazines are delivered to the dealers, with the retention of title in petitioner being merely a security device until they are paid for. Shipowners and Merchants Tugboat Co., 22 B.T.A. 1084 (1931), affirmed per curiam 66 F. 2d 1010 (C.A. 9, 1933). Cf. Readers' Pub. Corporation v. United States, 40 F. 2d 145 (Ct. Cls., 1930). Petitioner cites La Salle Cement Co. v. Commissioner, 59 F. 2d 361 (C.A. 7, 1932), modifying, 15 B.T.A. 1127 (1929), as support for its position. In that case the taxpayers sold cement delivered in cotton sacks to its customers. The price charged for the cement included the sacks and it was provided that on return of the sacks the customers received an agreed refund. The contracts provided that the sacks remained the property of the taxpayers and that the sacks were "leased" to the customers for a period not exceeding 90 days. For sacks bearing the brands of taxpayers which were disposed of *185 by the customer to persons other than taxpayers, the customer was obligated to pay taxpayers a stated amount as liquidated damages. The original cost of the sacks was considerably less than the refund taxpayers made on return of the sacks. The contractual relationship entered into in La Salle was held to be a lease arrangement. The parties called it a lease, title was retained by the taxpayers, and damages had to be paid if the customers disposed of the sacks to persons other than the taxpayers. The taxpayers had no intention of selling the sacks. They wanted the sacks returned so that they could be used again. They did not want any sack with their brand on it used by others. These factors are in direct contrast to the facts in the instant case. Petitioner herein did not want the magazines returned to it. Its business was distributing them, ultimately to be purchased by members of the public. As petitioner states, an out-of-date magazine returned by one of the dealers has little economic value. Petitioner's contracts provided, in effect, that title to the magazines passed to the dealers when the dealers paid for the magazines, and the dealers were obligated to pay their accounts *186 in full each week. In the La Salle case title to the sacks was specifically retained by taxpayers even though the customers had, in effect, paid for them by paying the price for the cement which included an amount for the sacks. Petitioner argues that the dealers paid only for magazines which were not returned by them to petitioner. One of the petitioner's witnesses testified to this effect. However, in view of the mandatory language in the contracts themselves, we view this testimony as a reference only to the fact that magazines returned by the dealers are credited against the amount due for magazines delivered by petitioner but that the offset does not vitiate the contractual terms requiring that magazines delivered to the dealers be "settled" for every week. Our conclusion respecting this witness' testimony is buttressed by the fact that he made a similar statement respecting petitioner's acquisitions from the publishers. He stated that petitioner paid only for magazines it did not return to the publishers. However, one of the contracts under which petitioner acquired magazines from some publishers provided beyond any doubt for a purchase by petitioner of magazines, to be paid *187 for by the middle of the month following delivery, notwithstanding the fact that petitioner might later return unsold magazines for full credit. Our decision on this issue has been based on the provisions of a contract, which the parties stipulated was applicable to deliveries made to most of petitioner's dealers. There is no evidence of record showing what the arrangement was with respect to the remainder of the dealers or that it varied from the terms of the contract which is in evidence. In view of this absence of proof, we assume the provisions of any other type of contract which may have existed between petitioner and its dealers would lend no more support to petitioner's position than does the type of contract which is in evidence. Because income from the sale accrues on delivery of the magazines to the dealer, petitioner may not reduce its income for the taxable year by any amount representing magazines which remained unsold on the dealer's shelves at the close of the taxable year ended June 30, 1959. Petitioner contends in the alternative that if it is not permitted to treat magazine returns received in July 1959 as applicable to the taxable year ended June 30, 1959, it *188 should be permitted to reverse the adjustment it made for the fiscal year ended June 30, 1959, for magazine returns received in July 1958. Respondent contends that petitioner, for its fiscal year 1959, increased sales returns, thus reducing sales income by $115,759.96, which represents the amount of magazine returns received in July 1958. Respondent's position apparently is that since petitioner has received the benefit from the reduction of income resulting from the July 1958 magazine returns, no other adjustment is necessary for petitioner to reflect accurately its income. Respondent's position overlooks the fact that although July 1958 sales returns were included in the total of sales returns for the taxable year, the amount of $90,292.77 representing the portion of the July 1958 sales returns which petitioner computed as applicable to magazines on dealers' racks as of June 30, 1958, was deducted from the year's total sales returns in a year-end entry made as of June 28, 1959, on the same page of petitioner's journal on which the year-end entry increasing such sales returns by $93,394.24 was made. It is this $90,292.77 of sales returns which petitioner now seeks to have restored *189 to the taxable year. Under our decision that petitioner's sales returns adjustment is not proper, the $90,292.77 used to decrease such returns as representing magazines on dealers' racks as of July 1958, must be added back to petitioner's sales returns for its fiscal year ended June 30, 1959. Otherwise petitioner will be charged with 12 months of income and only approximately 11 months of sales returns. The $115,759.96 which respondent contends petitioner has already deducted for July 1958 has in effect been reduced by the $90,292.77 year-end adjustment made by petitioner on its journal under date of June 28, 1959. It is true that petitioner's partnership predecessor added the $90,292.77 sales returns to its fiscal year ended June 29, 1958, thus receiving the benefit of a lowered income resulting thereby unless an offsetting adjustment by the partnership completely offset such reduction in income which the record indicates might have been the situation. In any event, the partners of the partnership are not parties to the present case and no adjustments to their income, as reported, for any year are involved in this case. We hold that the net effect of all petitioner's year-end *190 entries has been to decrease improperly its taxable income for the year here in issue by $369.20. Compensation Issue Respondent disallowed deduction of all but $600 of the $12,000 claimed by petitioner as salary expense paid to Venus. Respondent argues basically that Venus was not performing any function for the corporation other than those incidental services a "good wife" would always perform in assisting her husband who is in business, citing Duval Motor Company, 28 T.C. 42 (1957), affd. 264 F. 2d 548 (C.A. 5, 1959). The evidence shows clearly to the contrary. Venus testified as to her services to petitioner. From observing her demeanor as a witness and listening to her testify, it is apparent that she is a capable, persuasive, and poised businesswoman. Venus maintained an office for petitioner in her home. She answered phone calls from members of the public complaining about certain magazines petitioner was distributing. She read over advance copies of magazine issues to be distributed by petitioner to determine whether the issues contained any material objectionable to the public. In addition to these tasks Venus performed the functions of (1) *191 conferring with Scott Krauss and Frost on all major problems of the corporation, (2) attending meetings with Ulrich, petitioner's auditor who came to Columbus four times a year, (3) doing public relations work in the form of talks before women's clubs and similar organizations stressing the advantages of purchasing magazines from newsstands rather than by mail subscription, (4) reviewing bills submitted to petitioner and signing checks in payment thereof, (5) doing work in connection with selecting a new color for petitioner's delivery trucks, (6) suggesting a new personnel policy, which petitioner adopted, whereby each keyman in petitioner's organization had a well-trained assistant, and (7) checking newsstands to see if the magazine displays were correctly set up so that the full cover of the magazines was visible. The evidence shows that Venus was instrumental in the affairs of the corporation and that her services far exceeded the usual endeavors of the so-called "good wife." Venus testified that she spent 4 to 5 hours a day or 100 to 110 hours a month in performing her services for petitioner. Prior to the taxable year Venus had been in the magazine business, first as a partner *192 alone with her husband and, since 1948, with Lowell Frost as a third partner. Prior to her marriage to Scott Krauss, Venus had been employed by a department store for 14 years where she held a variety of supervisory positions. Ulrich stated as his opinion, based on his observance of Venus' activities and on a hypothetical question encompassing facts relative to Venus' activities for petitioner which we have found to be the activities she did perform for the company, that the fair value of Venus' services for the taxable year here in issue was $15,000. Ulrich has had considerable experience doing audits and cost analyses for magazine distributors similar to petitioner. We consider Ulrich's testimony in effect, as being a statement of what competing magazine distributors would pay a person for performing functions comparable to those performed by Venus for petitioner. Respondent's counsel did not cross-examine Ulrich with respect to his opinion as to the value of Venus' services to petitioner, nor is there any other evidence or factor in the record from which any inference might reasonably be drawn that Venus' services to petitioner were of a lesser value than Ulrich considered them *193 to be. Ulrich's testimony is entitled to considerable weight. It is not of the caliber that can be rejected on the ground of being highly improbable or manifestly unreasonable even though uncontradicted. See Carmack v. Commissioner, 183 F. 2d 1 (C.A. 5, 1950) affirming a Memorandum Opinion of this Court. Respondent has offered no evidence to rebut either the affirmative evidence adduced by petitioner or the opinion by Ulrich as to the value to petitioner of Venus' services. Respondent's contentions are that during the taxable year Scott Krauss was recuperating from a serious operation and that Venus must have spent a large share of her time nursing her husband and that any services Venus did render to petitioner were in the nature of protecting the Krauss' capital investment in the business rather than performing any specified duties as an officer of petitioner. Respondent's first point is mere speculation. It is based on the lack of evidence showing that the Krausses hired a nurse for Scott Krauss during the taxable year. The record shows that the doctors were fearful that Scott Krauss would not recover his ability to walk but does not otherwise show the nature of *194 his illness or whether a nurse or nursing services were required for him. The record contains affirmative evidence of Venus' work for petitioner. If she also performed nursing services for her husband, such services were in addition to the services she performed for petitioner. It might be noted that the record does show that during the taxable year Venus employed a maid 5 days a week to assist with the work in her home. The evidence shows that Venus' services for petitioner were primarily in connection with its operations as distinguished from activities for the purpose of protecting the Krausses' capital interest in the business. Although it appears many of Venus' duties for the corporation were not of a regularly assigned or routine nature, all the services she performed during the taxable year were operational in character. Of course, all services which increase sales or assist in the management of an enterprise will have a beneficial effect on the owners' capital interest in the enterprise. However, expenditures for such services are deductible by the enterprise, even though these services are rendered by one who has a capital interest in the business. Respondent also contends *195 that petitioner failed to offer the testimony of Frost, petitioner's vice president, respecting the reasonableness of Venus' salary, and that this omission raises an inference that Frost's testimony would have been unfavorable to petitioner's case, citing Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). Under the facts of the instant case no inference adverse to petitioner is warranted from the fact that Frost did not testify in regard to Venus' services to petitioner. In the Wichita case the record contained implications which were adverse to the taxpayer and which, if untrue, could readily have been disproved by the taxpayer. The Court stated that, in such a situation, the failure of the taxpayer to introduce evidence raises the inference that such evidence would have been adverse to it. In the present case Ulrich and Scott and Venus Krauss each testified relative to the services rendered by Venus. Respondent did not cross-examine Scott Krauss or Ulrich at all on this issue and did not cross-examine Venus extensively on her testimony. Frost was present in Court during the trial and available to be called as a witness *196 by either party on the compensation issue. He did testify on the other issue in this case. Another factor pointing to the conclusion that Venus' services were substantial is that for the partnership year ended June 29, 1958, Venus and Frost received equal shares of the partnership income, $14,830.14 each. The record does not specifically show the extent of Frost's interest in the partnership but the inference is that he and Venus had an equal interest. Frost being unrelated to the Krausses would have been expected to insist that a distribution of partnership income fairly reflect both the capital interest of the partners and the services rendered by each partner to the business which indicates that the value of Frost's and Venus' services to the partnership during its fiscal year 1958 was considered by the partners as comparable. During the year here in issue, Venus rendered the same type of services to petitioner which she had previously rendered to the partnership and some additional services. For the taxable year here in issue, Frost was paid a salary of $20,000 which respondent does not challenge. Based on an evaluation of all the evidence we found as a fact that a reasonable *197 salary for Venus' services to petitioner for its fiscal year ended June 30, 1959, is $12,000 and hold that petitioner is entitled to a deduction in this amount for compensation paid to Venus in its fiscal year ended June 30, 1959. Decision will be entered under Rule 50. Footnotes
1. Petitioner's Sales Returned ledger and journal both show sales returns for this period to be $118,978.44.↩