AHMET ERTEGUN and IOANA ERTEGUN, Et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Ertegun v. Commissioner
Docket Nos. 3830-71, 3831-71, 3868-71, 3908-71.
United States Tax Court
T.C. Memo 1975-27; 1975 Tax Ct. Memo LEXIS 345; 34 T.C.M. (CCH) 122; T.C.M. (RIA) 750027; February 13, 1975, Filed Alfred D. Youngwood,Mark M. Weinstein, and George P. Felleman, for the petitioners. Stanley Goldberg and E. Noel Harwerth, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the income tax of petitioners in the following amounts: Taxable Year
Docket No.
Petitioner
and Period
Deficiency 3830-71
Ahmet Ertegun and
1967
$ 79,273.43
Ioana Ertegun
3831-71
Gerald Wexler and
1967
66,235.02
Shirley Wexler
3868-71
Nesuhi Ertegun and
1967
44,290.81
Belkis Ertegun
3908-71
Atlantic Records Sales
6/1/67 to
Co., Inc.
11/30/67
19,023.39
$ 208,822.65
As a result of concessions by the parties, the sole issue for our determination is whether for the fiscal year ended May 31, 1967, Atlantic Records Sales Co., Inc. (hereinafter "Atlantic") is entitled to accrue, either as an offset against gross sales pursuant to section 451 [2] or as a deduction *347 from gross income pursuant to section 461, a 10 percent record return allowance permitted on sales of single records to its regular distributors. The resolution of such question as to Atlantic, a duly elected subchapter S corporation under section 1372, for its fiscal year ended May 31, 1967, shall be determinative of whether the individual petitioners, who were shareholders therein for such period, are entitled to account for such accrual in computing their respective shares of the corporation's "undistributed taxable income" for such period. If we find that Atlantic is not entitled to accrue such allowance for the period in question, either as an offset to gross sales or as a deduction from gross income, an appropriate adjustment will be made in the taxable income of Atlantic for the taxable period ended November 30, 1967. FINDINGS OF FACT Some of the facts have been stipulated. Such stipulations and the exhibits attached thereto are incorporated herein by this reference. Petitioners in docket No. 3830-71 are Ahmet Ertegun and Ioana Ertegun, husband and wife, *348 whose legal residence at the time of the filing of the petition herein was New York, New York. They filed a timely joint Federal income tax return for the taxable year 1967 with the district director of internal revenue, Manhattan District, New York. Petitioners in docket No. 3831-71 are Gerald Wexler and Shirley Wexler, husband and wife, whose legal residence at the time of the filing of the petition herein was East Marion, New York. They timely filed their joint Federal income tax return for the taxable year 1967 with the district director of internal revenue, Brooklyn District, New York. Petitioners in docket No. 3868-71 are Nesuhi Ertegun and Belkis Ertegun, husband and wife, whose legal residence at the time of the filing of the petition herein was New York, New York. They timely filed their joint Federal income tax return for the taxable year 1967 with the district director of internal revenue, Manhattan District, New York. Ioana Ertegun, Shirley Wexler, and Belkis Ertegun are petitioners in their respective cases solely by reason of their filing joint Federal income tax returns for the calendar year 1967 with their respective husbands. All subsequent references to "individual *349 petitioners" shall refer to Ahmet Ertegun, Gerald Wexler, and Nesuhi Ertegun, collectively. Petitioner in docket No. 3908-71 is Atlantic, a corporation organized under the laws of the State of New York and having its principal place of business in New York, New York. During the period in question, Atlantic was a duly elected subchapter S corporation under section 1372 through its fiscal year ended May 31, 1967. It was dissolved on December 1, 1967. Atlantic filed a Federal U.S. Small Business Corporation income tax return for the taxable year ended May 31, 1967 and a regular Federal corporate income tax return for the taxable period ended November 30, 1967 with the district director of internal revenue, Manhattan District, New York. Atlantic was on the accrual method of accounting for Federal income tax purposes. At all times pertinent herein, Atlantic had 8,872 shares of common stock issued and outstanding. Individual petitioners Ahmet Ertegun, Gerald Wexler, and Nesuhi Ertegun collectively owned all of such stock in the amounts of 3,741 shares, 2,957 shares, and 2,174 shares, respectively. [3]
*350 As of November 30, 1967, the individual petitioners had sold all of their Atlantic common stock to Atlantic Recording Corp., a corporation organized under the laws of the State of Delaware, and a member of an "affiliated group" of corporations of which Warner Bros.-Seven Arts, Inc., was the "common parent" as defined in section 1504. As of such time, Atlantic's election as a small business corporation terminated pursuant to section 1372(e)(3). Atlantic was engaged in the business of selling phonograph records at wholesale, consisting of both 45 rpm singles (hereinafter sometimes referred to as "singles") and 33 rpm albums (hereinafter referred to as "albums"). Atlantic sold regularly only to approximately 58 distributors, 41 of whom were considered to be its "regular distributors." The remaining 17 distributors were post exchanges, mail order houses and exporters. During the period in question, Atlantic granted to its "regular" distributors a 3 percent discount on the sales price of albums. The customers who were mail order houses, military post exchanges or exporters did not receive the reduction. The 3 percent discount was based on the amount of net purchases made by the *351 distributors for each calendar quarter and was granted prior to the invoices being paid in full. The credits based on the 3 percent discount were issued to distributors 2 to 3 weeks after the end of such period and were used to offset the next remittance. The discount was not dependent on any future purchases nor was any future action on the part of the distributors required. In addition to the 3 percent discount on album purchases, Atlantic also granted its regular distributors a 10 percent record return allowance on the purchases of single records. The invoice on the sales of singles stated that no merchandise was returnable "without written authorization from this office." The amount of singles a distributor was permitted to return under the 10 percent allowance was computed at the end of each calendar quarter and was based upon the net purchases of single records during such period. The authorization for the return of the records was then issued, generally within 2 to 3 weeks after the end of the quarter. The singles returned by the distributors were sent directly to Atlantic's factory, at which time the company would issue a credit memorandum for use against future remittances. *352 The 10 percent allowance enabled the distributors to obtain a full rebate up to the 10 percent limit on those singles which were wortheless or could not be sold. The benefit of the allowance to Atlantic was that it effected a reduction in its net sales to distributors, a figure which was used to determine royalty payments to its recording artists. The returned singles were generally scrapped by Atlantic. If a distributor wanted to return more singles than permitted by the quarterly authorization, he would have to negotiate the return of the excess singles with Atlantic. In the event that a customer did not have enough single records on hand to take full advantage of the return allowance, he was allowed to purchase singles with Atlantic labels from jobbers and use them for purposes of the return allowance. [4]
The singles returned by the distributors did not have to be records purchased in the period to which the 10 percent allowance would apply. No attempt was *353 made by Atlantic to coordinate the records returned with the individual purchases by its regular distributors. On purchase of singles, the entire amount of the invoice would be due on the tenth day of the month following the month of purchase. Atlantic provided for a 2 percent cash discount for prompt payment of bills. Atlantic did not reduce its sales by the amount of this discount until such time as the payments were timely made and the discount earned. [5]
On its books, Atlantic accounted for the sale of its singles and the 10 percent return allowance on such sales in the following manner. At the time of the sale, the full invoice price of the records was debited to its accounts receivable and credited to its sales account. At the end of the quarter or fiscal period, Atlantic computed the 10 percent allowance due its distributors and made an accrual entry to its sales returns and allowances account to that extent. The company simultaneously *354 made entries reducing its royalty expense based on such accrual. As of the first day of the next quarter or fiscal period, Atlantic credited its sales returns and allowances account and debited its accounts receivable in the above amount, thereby reversing the prior accrual entry. When the credit memorandums were subsequently issued to the distributors reflecting receipt of the single records at its factory, Atlantic debited its return and allowances account again and reduced its accounts receivable to that extent. The same procedure was followed by Atlantic with respect to its 3 percent discount. As of its fiscal year ended May 31, 1967, Atlantic had a debit balance in its returns and allowances account with respect to its 3 percent discount and 10 percent allowance in the amounts of $48,531 and $241,584, respectively. These balances represented discounts or allowances on purchases by distributors in April and May of 1967. On June 1, 1967, Atlantic made reversing entries of the above debit balances. On their respective joint Federal income tax returns for the calendar year 1967, the individual petitioners included in their gross income their respective shares of the "undistributed *355 taxable income" of Atlantic for the period ended May 31, 1967 pursuant to section 1373(b). Such "undistributed taxable income" reflected the reduction by Atlantic to its sales income on account of the accruals made for the 3 percent discount and the 10 percent allowance for such period. In his notice of deficiency to each of the individual petitioners, respondent increased the taxable income of Atlantic by the balance in the account for sales returns and allowances attributable to the 3 percent discount and 10 percent allowance as of May 31, 1967. This effectively increased each petitioner's ratable share of Atlantic's undistributed taxable income. Due to a concession by respondent, only the propriety of the accrual by Atlantic of the 10 percent allowance is now in issue. The parties have agreed and stipulated that if an adjustment to Atlantic's undistributed taxable income for its fiscal year ended May 31, 1967 is mandated, a corresponding adjustment shall be made to the taxable income of Atlantic for the period ended November 30, 1967. OPINION The sole question for our determination is whether for its fiscal year ending May 31, 1967, Atlantic is entitled to accrue, either *356 as an offset to its gross sales or as a deduction from gross income, a 10 percent record return allowance on sales of single records to its regular distributors. Through prearrangement with its regular distributors, Atlantic uniformly granted a 10 percent record return allowance on all purchases of single records. The amount of single records each distributor was permitted to return was based upon the number of single records purchased by the distributor as of the end of a calendar quarter. An authorization for the return of records was issued to the distributor within 2 to 3 weeks after the end of the quarter. To receive credit under the authorization, however, the distributor was required to return the singles directly to Atlantic's factory. On receipt of the records at its factory, Atlantic would issue a credit memorandum to the distributor for use against future remittances. At the end of a quarter or fiscal period, Atlantic would account for the 10 percent allowance on its books by debiting its sales returns and allowances account by the amount of the return authorization granted for that period. On the first day of the next quarter or fiscal period, it made the normal reversing *357 entries. When the records were delivered to its factory, a credit memorandum was issued to the distributor and the books adjusted accordingly. [6]
As of its fiscal year ended May 31, 1967, Atlantic had a debit balance in its sales returns and allowances account in the amount of $241,584. This balance related to sales made during the months of April and May of 1967. Atlantic argues that since its liability for such allowance was fixed and certain as of the end of this period, it was entitled to accrue this amount as an offset to gross sales. Respondent, on the other hand, contends such amount cannot be accrued either as an offset to gross sales or as a deduction from gross income since Atlantic's liability on account of such allowance was contingent and indeterminable as of the end of this period. Whether we view the issue before us as one of inclusion or one of deduction, the result is the same. No accrual may be allowed on account of the 10 percent record return allowance for the period in question. Atlantic kept its books and computed its taxable *358 income on the accrual method of accounting for the period in question. The regulations under section 451 provide that where a taxpayer is on the accrual basis of accounting, income is includable in gross income in the taxable year in which "all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." See section 1.451-1(a), Income Tax Regs. See also Spring City Co. v. Commissioner,292 U.S. 182 (1934), and Security Mills Co. v. Commissioner,321 U.S. 281 (1944). A similar rule exists under section 461 with respect to determining the proper taxable year in which an accrual basis taxpayer may claim deductions from gross income.[7] See also United States v. Anderson,269 U.S. 422 (1926). *359 Atlantic contends that pursuant to section 451, it was entitled to offset its gross sales for its fiscal year ended May 31, 1967 by the 10 percent return allowance granted its regular distributors on such sales. In support of its position, Atlantic argues that its 10 percent record return allowance merits the same treatment as the "price discounts" involved in Pittsburgh Milk Co.,26 T.C. 707 (1956). See also Atzingen-Whitehouse Dairy, Inc.,36 T.C. 173 (1961). In that case, petitioner was in the business of selling milk and related dairy products at the wholesale and retail levels. Petitioner sold milk at a discount below the list price fixed by the Milk Control Commission. The amount of the discount was agreed upon orally between petitioner and its customer as a result of the illegality of such arrangement. On its books, the petitioner accounted for its milk sales at the list price as fixed by law and deducted its price discounts as advertising expenses. This Court held that petitioner had the right to receive from its customers only the list price less the discount orally agreed upon. As such, petitioner was permitted to report its sales of *360 milk at net prices. The issue of whether petitioner would have been able to deduct such discounts from gross income was never reached. The facts of our case are distinguishable from those in Pittsburgh Milk Co.,supra. During the period in question, Atlantic always had the right to collect the full purchase price from its regular distributors on the sales of single records. This right was in no way affected or diminished by Atlantic subsequently issuing authorizations for the return of 10 percent of the singles sold during such period. Indeed, under the payment plan in effect, the full purchase price on these singles were due and owing before any return authorization was issued with respect to such records. [8] It so recorded each sales transaction on its books, in addition to computing its 2 percent cash discount on that basis. Furthermore, the return authorizations issued to its distributors after the end of each quarter merely represented a right to return *361 single records at full credit up to a specified limit. To receive credit under the authorization, the distributor was required to return the single records directly to Atlantic's factory. The price discounts in Pittsburgh Milk Co.,supra, were not contingent upon some subsequent event. They were uniformly granted at the time of the sale without any requirement of future performance. This Court analogized the discounts involved to "trade discounts" which we have always recognized as proper reduction against gross sales. See also American Cigar Co.,21 B.T.A. 464 (1930), affirming 66 F. 2d 425 (C.A. 2, 1933). The 10 percent allowance involved herein can in no way be compared to the discounts in Pittsburgh Milk Co.,supra, or general trade discounts. At the outset, Atlantic charged the distributors the full price (less 2 percent for prompt payment) contingent only upon the return of wholly unrelated merchandise. The 10 percent allowance in question was not a discount on current sales, but only a measure of how many obsolete records petitioner would accept for credit. Atlantic had no liability for the 10 percent *362 return allowance until the actual return of single records to its factory. Atlantic's liability did not and could not arise until after the taxable period in question. As such, it could not, ipso facto, have any effect on the sales made during such period. This situation is to be distinguished from the 3 percent discount given by Atlantic on the sales of its albums, the accrual of which against gross sales respondent apparently now concedes. For the same reason as cited above, Atlantic is also not permitted to accrue the debit balance in its sales returns and allowances account as a deduction from its gross income. Atlantic's liability on account of its 10 percent record return allowance was never irrevocably fixed or certain until the single records were actually returned to the factory. Since this event did not occur until after the period in question, no accrual on account thereof may be permitted. It is firmly established that a reserve for future or contingent liabilities cannot be deducted. [9]Lucas v. American Code Co.,280 U.S. 445 (1930). *363 Atlantic contends that during the period in question, all the distributors eligible for the 10 percent allowance took maximum benefit thereof. However well this may be, the fact remains that Atlantic's liability with respect to such allowance was contingent upon the actual return of the singles to its factory, an event occurring subsequent to the period in question. Furthermore, its claim that the distributors always took full advantage of the allowance for each quarter is not adequately substantiated on the basis of the record before us. The arrangement entered into between Atlantic and its regular distributors may be best described as "sale or return" contract, subject to a 10 percent limitation. This Court has consistently held that an accrual for anticipated returns in this situation is not permissible, either as an offset against gross sales or as a deduction from gross income. [10]
In accordance with the above, Decisions will be entered under Rule 155.
Footnotes
1. The cases of the following petitioners are consolidated herewith: Gerald Wexler and Shirley Wexler, docket No. 3831-71; Nesuhi Ertegun and Belkis Ertegun, docket No. 3868-71; and Atlantic Record Sales Co., Inc., docket No. 3908-71. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. In terms of percentage, the stock ownership of the individual petitioners in Atlantic was 42.17 percent, 33.33 percent, and 24.50 percent, respectively.↩
4. Single records purchased from jobbers would cost the distributor between 5 and 15 cents each. He would then return the records to Atlantic for a credit of 38.5 cents each, the regular wholesale price of a single.↩
5. The same 2 percent cash discount was equally applicable to the purchase of albums. Atlantic had a 30-60-90 day payment plan in effect for its albums, with the initial payment due on the tenth day of the month following the month of purchase.↩
6. The sales return and allowance account was debited and the accounts receivable credited in the amount of the credit memorandum.↩
7. The regulations under sec. 461 provide, in pertinent part, as follows: § 1.461-1 General rule for taxable year of deduction. (a) General rule-- * * * (2) Taxpayer using an accrual method.↩ Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * *
8. Payments on the purchase of singles were due on the tenth day following the month of purchase. The return authorization was not generally issued until 2 to 3 weeks after the end of the quarter.↩
9. As part of the 1954 Code, Congress enacted sec. 462 which permitted taxpayers to deduct reserves for estimated expenses. The principal requirement of the statute was that the estimated expense be attributable to the income of the taxable year and that the Treasury was satisfied that the amount of the expense could be estimated with reasonable accuracy. Upon further reflection, however, Congress realized that the Treasury would suffer substantial losses as a result of taxpayers switching to the reserve method in the transition year. Consequently, sec. 462 was repealed retroactively in 1955 by Pub. L. No. 74, 84th Cong., 1st Sess., sec. 1(b).↩
10. See J.J. Little & Ives Co., Inc., T.C. Memo. 1966-68;Scott Krauss News Agency, Inc.,T.C. Memo. 1964-171↩.