Ahmet ERTEGUN and Ioana
Ertegun, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

Gerald WEXLER and Shirley
Wexler, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

Nesuhi ERTEGUN and Belkis
Ertegun, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellee.

Nos. 553, 756, 757, Dockets 75–4193,
75–4194, 75–4195.

United States Court of Appeals,
Second Circuit.

Argued Jan. 19, 1976.

Decided March 9, 1976.

Alfred D. Youngwood, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, George P. Felleman and Mark M. Weinstein, New York City, of counsel), for appellants.

Arthur L. Bailey, Atty., Tax Div., Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Gilbert E. Andrews and Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before LUMBARD, SMITH and MANSFIELD, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Until December 1, 1967, Atlantic Records Sales Company, Inc. was a closely-held corporation, qualifying for and electing to receive the special tax treatment of Subchapter S of the Internal Revenue Code. 26 U.S.C. § 1371 et seq. The appellants are the former shareholders of Atlantic who, pursuant to the provisions of Subchapter S, included Atlantic's undistributed taxable income in their own gross (and therefore taxable) incomes on a pro rata basis. 26 U.S.C. § 1373.

This appeal arises from a disagreement between the appellant-shareholders and the Internal Revenue Service as to the proper calculation of Atlantic's undistributed taxable income for the tax year which ended on May 31, 1967. Appellants would recalculate and reduce Atlantic's undistributed taxable income for the year in question, and thereby lower their reportable incomes and tax liabilities as Atlantic shareholders. The IRS would increase the tax liability of the appellant-shareholders by increasing their calculation of Atlantic's undistributed taxable income which, in turn, would increase the gross and taxable incomes of the appellants.

Atlantic was a wholesaler of records which sold merchandise to approximately 60 distributors. Under the terms of sale 41 of these distributors had a right to return unsold records to Atlantic after the end of each calendar quarter and thereby receive a credit towards their respective bills from Atlantic for the next three-month period.

Those distributors who possessed the right to return unsold records were guaranteed that unsold merchandise would be accepted by Atlantic, up to an amount equal to ten percent of the distributors' purchases from Atlantic in the quarter which had just ended. On a case-by-case basis, distributors were often allowed to return unsold merchandise to Atlantic in an amount in excess of the ten percent figure.

Thus, upon the completion of each three-month period, distributors would routinely return unsold records to Atlantic and would receive credit equal in value to ten percent of the distributors' purchases from Atlantic in the recently-completed quarter. If a dis-

tributor had insufficient unsold records at the close of a three-month period, he was allowed to purchase unsold records from other distributors and return them to Atlantic, again, up to the ten percent figure. Returns in excess of the ten percent limit were negotiated individually with Atlantic.

Atlantic's 1967 tax year ended on May 31, 1967. However, Atlantic's second quarter for 1967 did not end until June 30, 1967. Hence, when Atlantic calculated its taxable income for 1967, it had completed only two months (April and May) of the current calendar quarter. The return of records purchased in April and May, but unsold by the distributors, was not to occur until after the end of the calendar quarter on June 30.

Since the closing of the calendar quarter was not to occur until June 30, 1967, and since the return of unsold records for the April-May-June quarter would not begin until after June 30, 1967, Atlantic calculated its taxes on May 31, 1967 in the following manner: All sales made in April and May were included in the gross income of the year ending on May 31, 1967. However, the income from April and May sales was reduced by ten percent, the amount of credit which Atlantic anticipated it would extend after June 30 for records which had been purchased in April and May, but which were to be returned unsold.

It is the position of the IRS that Atlantic's 1967 tax returns should include the full value of all April and May sales, but that this figure should *not* be reduced by ten percent in anticipation of subsequent returns of unsold merchandise to Atlantic. The government maintains that the ten percent credit for unsold records was not actually extended by Atlantic until after June 30, 1967, since the unsold records were not sent back to Atlantic until after that date. Since the returns actually occurred in the next tax year (*i.* e., tax year 1968 beginning on June 1, 1967), according to the IRS, the ten percent credit for unsold records should be accounted for in the 1968 tax return, not anticipated in advance on the 1967 return.

The appellant-stockholders advance two arguments for anticipating the ten percent credit for April and May sales on Atlantic's 1967 return. First, they argue that Atlantic's status as an accrual basis taxpayer required that the anticipated ten percent credit be accounted for at the time the records were sold. According to this theory, the ten percent return credit, in practice, amounted to an automatic ten percent liability for Atlantic for each record that it sold. Since, in appellants' view, the ten percent credit could be expected automatically after each quarter, Atlantic accrued its ten percent return credit liability for each record at the time the record was sold. Hence, the ten percent return credit liability accrued to Atlantic in April and May when the records were sold to the distributors.

Alternatively, appellants argue that extension of the ten percent return credit can be characterized as an automatic price discount given to select distributors. Since the ten percent credit was "automatic," appellants claim, both the distributors and Atlantic knew the "real" price of the records to be only 90 percent of the nominal price since ten percent of the nominal price was inevitably to be credited upon the return of unsold records. Since the "real" price of the records was only 90 percent of the nominal price, only that 90 percent should be reported as income in the first instance.

In the proceeding below, the Tax Court (William H. Quealy, *Judge*) rejected both appellants' accrued liability theory and their price discount theory. In upholding the position of the IRS, the Tax Court held that the return arrangement between Atlantic and certain of its distributors was merely a regular sales contract with a contingent option in the distributors to return unsold merchandise. The return credit was held to have no effect until it was formally extended in the tax year 1968 since, until then, the credit was contingent upon actual return of the unsold records to Atlantic. *Ertegun v. Commissioner*, T.C. (1975).

After examining the contentions of the parties on this appeal and reviewing the decision of the Tax Court, we hold that decision to be correct and, accordingly, we affirm.

## A. Atlantic's Credit Policy

The critical question in this case has to do with the nature of Atlantic's credit return policy. The IRS characterizes Atlantic's agreement with its distributors as a regular sales contract with an option in the distributors to return unsold merchandise for credit refunds. The IRS would thus analogize Atlantic's credit practices to those considered in *J. J. Little & Ives Co. v. Commissioner*, 25 T.C.M. 372 (1966), and *Scott Krauss News Agency, Inc. v. Commissioner*, 23 T.C.M. 1007 (1964).

In the view of the IRS, Atlantic extended its credit refund because the distributors performed a significant service: unsold records returned to Atlantic were destroyed by Atlantic and reduced the royalties paid by Atlantic to its recording stars, since those royalties were based on the number of records sold net of returns.

Certain distributors, therefore, possessed a standing right to return unsold merchandise for credit. However, in the absence of such returns, no credit was forthcoming from Atlantic. Hence, in the view of the IRS, Atlantic incurred no liability for the credit refund until the distributors actually returned unsold records.

In the case at bar, records were sold by Atlantic to its distributors in fiscal 1967, *i. e.*, in April and May of 1967. The subsequent returns and refunds did not occur until fiscal 1968. Accordingly, the IRS concludes, the ten percent credit liability should be accounted for on Atlantic's 1968, rather than its 1967, tax return.

The appellant-shareholders disagree. They characterize the return of unsold records as a mere "ministerial" act which did not affect the substance of Atlantic's relations with its distributors. In appellants' view, the unsold records were not returned *quid pro quo* for the credit refund. Rather, the credit refund was, in fact if not in form, automatic and was incurred at the moment the records were first sold to the distributors.

The Tax Court disagreed with the appellants and so do we. Three facts lead us to accept the IRS's characterization of Atlantic's credit policies. First, if unsold records were not returned, no credit was advanced by Atlantic and no reduction in royalties was available to Atlantic. Thus, the return of the records cannot be dismissed as a merely "ministerial" act. That unsold records usually were returned to Atlantic does not alter the fact that, in the absence of such return, the refund would not have been extended.

Thus, the *quid pro quo* between Atlantic and its distributors was a real one and one with clear tax consequences.

Second, a distributor who sold all of his records was eligible for the credit refund, but only if he purchased unsold records from other sources and returned them to Atlantic. It thus appears that the return of unsold records, far from being an empty formality, was an important service for which Atlantic paid its distributors. Atlantic derived a significant benefit from the return of unsold records: it was thereby enabled to reduce royalty obligations to its recording artists.

Third, Atlantic extended to its distributors a two percent discount on their respective bills in consideration for prompt payment by the distributors. This two percent discount was calculated by Atlantic on the basis of the full invoice price paid by the distributors, not on the basis of that price reduced by the anticipated ten percent credit. Hence, in its billing procedures, Atlantic indicated that it considered the full price (*i. e.*, the price without the return credit) to be the "real" price, at least for purposes of the prompt payment discount.

Accordingly, we agree with the Tax Court and the IRS that the agreement between Atlantic and its distributors was a

regular sales contract with an option to return unsold merchandise for credit, that the return of unsold records to Atlantic was not an empty formality but an important service for which Atlantic paid its distributors and that Atlantic's credit liability was not incurred until the time when unsold merchandise was actually returned. Since the returns in question occurred in fiscal 1968, rather than 1967, they had no tax consequences until 1968.

### B. The Accrued Liability Theory

■ Nevertheless, appellants assert that the decision of this court in *Central Cuba Sugar Co. v. Commissioner*, 198 F.2d 214 (2d Cir.), *cert. denied*, 344 U.S. 874, 73 S.Ct. 167, 97 L.Ed. 677 (1952), compels a different result. We disagree.

In *Central Cuba,* a New York corporation cultivated and processed sugar and sold it to distributors for subsequent marketing. The sugar-growing corporation (Central Cuba) used brokers to sell its processed product to distributors. The brokers who sold Central Cuba's sugar to the distributors received a brokerage commission from Central Cuba, based on the weight of the sugar sold.

Central Cuba did not deliver the sugar purchased from it until the fiscal year after the contract with the distributor was signed and it did not receive payment from the distributor until then. Brokerage commissions were not paid by Central Cuba until after Central Cuba had received payment from the distributor in the fiscal year after the contract was signed.

However, as an accrual basis taxpayer, Central Cuba reported the income from its sales in the year of the contract, not the subsequent year of delivery and payment.

The issue in *Central Cuba* was, *inter alia*, whether the brokerage commissions paid by Central Cuba were to be deducted as expenses in the fiscal year of the sales agreement or the subsequent fiscal year of delivery and payment. This court held that, under the circumstances of the case, the brokerage commissions were deductible in the year of the sales agreement.

In reaching its decision, the court held, *inter alia*, that "the services [of the brokers] had been performed" in the year of the sale, rather than the year of delivery. Hence, accrual of the brokerage commissions was appropriate in the year of sale. *Central Cuba, supra* at 217.

The facts in the instant case are quite different. In order to receive the ten percent credit refund, the distributors were required to physically return unsold records to Atlantic. This often required the distributors to locate and purchase unsold Atlantic records from other sources. Atlantic did not extend the refund credit out of the generosity of its heart. It provided these rebates as payment for an important service rendered by the distributors, the collection and return of unsold records to Atlantic which allowed Atlantic, in turn, to reduce royalty payments to its recording artists.

In the instant situation, this service was not performed by the distributors until the fiscal year 1968, *i. e.,* after June 30, 1967. Hence, in fiscal year 1967, *i. e.,* before May 31, 1967, there were important services yet to be performed by the distributors in consideration for their ten percent credit refund.

The distinction between this situation and *Central Cuba* is apparent: The brokers in *Central Cuba* had performed all their services in the year of the sales contract and, accordingly, their commissions became accrued liabilities in that year. The distributors here, however, did not complete their services until the return of the unsold records in fiscal 1968.

In short, *Central Cuba* supports the position of the IRS. The proposition of law established in *Central Cuba* is that liabilities do not accrue as deductible business expenses until the person to whom the taxpayer owes the liability performs the services for which the liability is incurred. The distributors did not perform their services

for Atlantic (the return of the unsold records) until the tax year 1968 and, hence, no liability accrued to Atlantic in 1967.

### C.  The Price Discount Theory

■  The alternative position asserted by the appellant-stockholders rests on *The Pittsburgh Milk Co. v. Commissioner*, 26 T.C. 707 (1956), a case arising from efforts by milk producers to evade state law price regulations by means of unlawful price discounts.  In *Pittsburgh Milk*, a Pennsylvania corporation made illegal agreements with its customers to rebate part of the price for milk established by state law.  Since Pittsburgh Milk was selling in the State of Pennsylvania, and since, at the time, Pennsylvania law mandated certain minimum prices for milk, Pittsburgh Milk could effectively lower its price below the legal minimum only by secretly (and unlawfully) rebating an agreed upon part of the purchase price.

The question before the Tax Court was the proper means of calculating Pittsburgh Milk's gross income.  Was such gross income to be based upon the legally-established minimum price or upon the legal price reduced by the amount of the rebate?  The Tax Court decided on the latter, holding that the "net price" (*i. e.*, the legal price minus the rebate) rather than the "gross [legal] price" was appropriate for the calculation of Pittsburgh Milk's sales income.

> Where, as here, the intention and purpose of the [rebate] allowance was to provide a formula for adjusting a specified gross price to an agreed net price, and where the making of such adjustment was not contingent upon any subsequent performance or consideration from the purchaser, then, regardless of the time or manner of the adjustment, the net selling price agreed upon must be given recognition for income tax purposes.

*Pittsburgh Milk, supra* at 717.  See, also, *Atzinger-Whitehouse Dairy, Inc. v. Commissioner*, 36 T.C. 173, 181 (1961), adhering to *Pittsburgh Milk.*

The problem with appellants' reliance on *Pittsburgh Milk* is that, as noted above, the ten percent rebate credit for Atlantic's distributors was "contingent upon [a] subsequent performance," *i. e.*, the return of the unsold records to Atlantic.  In the *Pittsburgh Milk* situation, the purchasers of milk were automatically entitled, by virtue of their purchases, to the price rebate.  Here, in contrast, there was no automatic entitlement.  The return of unsold records was required before the credit was extended.  Rather than a discount arrangement, Atlantic's record return privilege was a separate transaction, supported by its own consideration, with benefits flowing both to Atlantic and its distributors.  See *Pittsburgh Milk, supra* at 717.

It is true, as appellants assert, that the distributors almost always did return the unsold records necessary for the ten percent credit.  However, the facts remain that the return of the unsold merchandise was a prerequisite for extension of the credit and that failure to return unsold records resulted in forfeiture of the credit.

Hence, the situation here seems closer to the circumstances of *J. J. Little & Ives Co., supra*, and *Scott Krauss News Agency, Inc., supra*.  In those cases, magazine wholesalers had standing arrangements with their retail distributors, permitting the distributors to return unsold magazines for credit.  In both instances, the Tax Court held that the wholesalers did not accrue a credit liability to the distributors until the time the magazines were actually returned unsold.

■  In reaching this conclusion, the Tax Court was merely applying the well-established principle that "a liability does not accrue as long as it remains contingent."  Accrual occurs only when liability is "fixed and absolute."  *Brown v. Helvering*, 291 U.S. 193, 200–01, 54 S.Ct. 356, 360, 78 L.Ed. 725, 731 (1934).

### D.  Conclusion

Neither theory of the appellants can evade the major fact of this case: the ten percent credit was extended to distributors only if they returned sufficient unsold mer-

chandise. That such returns were made routinely does not change the fact that the returns were a prerequisite for receipt of the credit and that failure to return unsold records resulted in loss of the credit.

Hence, there was no liability accrued in the fiscal year 1967 for the records sold by Atlantic in April and May of 1967. Atlantic's ten percent liability to the distributors arose only when Atlantic received its unsold merchandise back, and that did not occur until fiscal 1968.

Moreover, Atlantic's credit policies did not establish an automatic price discount on its merchandise. Failure to return records would result in forfeiture of credit and full payment by the distributors.

In short, the ten percent credit in question did not give rise to liability until fiscal 1968 and any credit extended for records purchased in April and May of 1967 was properly excluded from the calculation of Atlantic's 1967 income.

The judgment of the Tax Court is affirmed.