CHALLENGE PUBLICATIONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Challenge Publications, Inc. v. Commissioner
Docket No. 4393-82.
United States Tax Court
T.C. Memo 1986-36; 1986 Tax Ct. Memo LEXIS 570; 51 T.C.M. (CCH) 342; T.C.M. (RIA) 86036; January 28, 1986. *570 Petitioner is a magazine publisher and it sold its magazines to a distributor, which, in turn, consigned the magazines to local wholesalers to distribute to local newsstands. Petitioner billed the distributor for the magazines shipped and agreed to extend credit to the distributor for unsold magazines. Petitioner accrued the aggregate sales price of the magazines it shipped during each respective taxable year as gross income for that taxable year. Petitioner also accrued as a deduction its estimate of the magazines that it anticipated would be returned to it. Held, petitioner's dealings with its distributor were on a sale or return basis, not a consignment basis. Held further, petitioner properly accrued as income the gross sales price of magazines shipped. Held further, respondent properly disallowed petitioner's claimed deductions for anticipated returns of unsold magazines. Irving M. Grant and V. Joseph Stubbs, for the petitioner. Michael C. Cohen, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated December 4, 1981, respondent determined deficiencies in petitioner's Federal income taxes as follows: Tax Year Ended
Deficiency
9/30/72
$546,278
9/30/73
931,546
9/30/74
292,313
9/30/75
1,321,821
9/30/76
1,434,840
After *571 concessions, the issues before the Court are: (1) whether petitioner's dealings with its distributor were on a consignment basis or on a sale or return basis, (2) whether petitioner properly accrued as income the gross sales price of magazines shipped to wholesalers, and (3) whether respondent properly disallowed petitioner's claimed deductions for anticipated returns of unsold magazines. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner, Challenge Publications, Inc., is a California corporation, which incorporated on October 17, 1963. During the years in issue, and at all relevant times, petitioner maintained its principal place of business in Canoga Park, California. Petitioner's books and records were kept and its Federal income tax returns were prepared and filed on an accrual method of accounting. The returns for the taxable years at issue were filed with the Internal Revenue Service at Fresno, California. Petitioner was, and continues to be, engaged in the business of publishing magazines that are sold to consumers through traditional *572 newsstands and other retail outlets, and by subscription. Each of petitioner's magazines (with the exception of "one-shots" as hereinafter described) is published with regular frequency. One-shots are magazines that have a special theme and are published by petitioner on a one-time basis. One-shots are sold only at newsstands and at other retail outlets, but not by subscription. Petitioner derived its revenues from the sale of advertising space and sales of its magazines. The vast majority of petitioner's magazine sales were made at the wholesale level to a national distributor, Publishers Distribution Corporation (hereinafter referred to as "PDC"), which, in turn, consigned the magazines tolocal wholesalers for distribution to local retailer newsstands. Petitioner first began using PDC as its national distributor for one of its magazines pursuant to a contract dated March 18, 1971. Subsequently, petitioner entered into identical agreements with PDC with respect to its other magazines. The pertinent provisions of the distribution agreement with PDC are as follows: 1. PUBLISHER AGREES: * * * (d) to bill Distributor for copies delivered at * * * [cents] per copy, * * * and to credit *573 Distributor for returns of all unsold copies evidenced by full copies, or front covers, or headings, or wholesaler affidavits, at the same price. * * * 2. DISTRIBUTOR AGREES: * * * (b) to pay Publisher on the basis of net sales of each issue, less Distributor's credits, as follows: * * * 1. An advance of 25% within 10 days after receipt of completion of shipping card. 2. Settlement 70 days after off sale subject to additional returns which will be charged to succeeding issues. [1]
3. Thirty (30) days after off-sale date of each issue, an amount not to exceed 80% of the balance remaining from the Distributor's estimate of net sale, less all previous advances. * * * 3. THE PARTIES AGREE: * * * (i) The loss, damage, or destruction to copies of said publication, or evidence of returns of unsold copies, while in transit, or in Distributor's possession, shall be at the risk of the Publisher. (j) This contract shall be construed to effect a consummated sale to Distributor of copies shipped F.O.B. to Distributor's consignees, subject only to the provisions hereof. Publisher and Distributor shall be creditor and debtor hereunder, respectively. No provision hereof shall be construed to *574 constitute or appoint Distributor or its consignees as Publisher's agent. (k) Publisher hereby authorizes Distributor to accept from Distributor's wholesalers and other sales outlest, front covers and/or headings as full evidence of unsold copies of said publication. Publisher further grants Distributor sole discretion to accept affidavits from Distributor's wholesalers and other sales outlets, provided such affidavit specifies the quantity of unsold copies of the particular issue for which credit is requested from Distributor. Publisher shall credit Distributor for all unsold copies evidenced by the aforesaid return provisions, as well as full copy return procedure hereinabove provided. (1) Approximately every 10 days following the off-sale date of each issue, Distributor shall furnish Publisher with a statement specifying the quantity of returns, as hereinabove provided, received by Distributor during said period. Publisher shall accept said statements as correctly reporting the quantity of said returns unless within 30 days after the date of mailing or delivery of said return statement to Publisher, Publisher mails or delivers to Distributor written objection to the accuracy of *575 said return statement. * * * On November 14, 1973, petitioner and PDC executed a new agreement that superseded all prior agreements, although the agreement, which covered all of petitioner's magazines, was substantially the same as the previous set of agreements. The November 14, 1973 agreement between petitioner and PDC was superseded by a new agreement dated April 9, 1976, which again was similar in substance to the prior agreements. [2]
At all relevant times, it was the general practice in the publishing industry for publishers to print and deliver to distributors' wholesalers for ultimate distribution to newsstands substantially more copies of magazines than were expected to be sold by the newsstands, and to accept returns of all unsold magazine copies. During each of the years *576 in issue, petitioner printed and delivered for sale availability at newsstands substantially more copies of its magazines than the newsstands ultimately sold and accepted returns of all unsold copies. Petitioner's reasons for overprinting included the desire by petitioner, PDC and the wholesalers to maximize exposure and maximize sales, and to achieve the widest distribution possible. The number of copies of each of petitioner's magazines to be printed and distributed for sale availability at newsstands was determined by petitioner in conjunction with PDC. These copies were then shipped directly from petitioner's printer to PDC's wholesalers. At that time, or shortly thereafter, petitioner would send to PDC an invoice reflecting the gross sales price to PDC of magazines shipped to PDC's wholesalers. Petitioner determined the "on-sale" date with respect to each issue of each magazine. This was intended to be the date that each issue was delivered by the wholesaler to the retailer and placed on the retailer's newsstand or otherwise made available for sale. In most cases, the retailers abided by the on-sale date by making petitioner's magazines available for sale on such date. The *577 "off-sale" date with respect to each issue of each magazine was the on-sale date of the next succeeding issue of such magazine, unless otherwise provided in petitioner's distribution agreement with PDC. At the time the retailer received a new issue of one of petitioner's magazines, the retailer would replace all unsold copies of the preceeding issue with copies of the new issues. These unsold copies would then be returned by the retailer to the wholesaler who, in turn, would return or report such copies to PDC. Generally, the wholesaler would verify to PDC the number of returns from retailers by sending a portion of the cover of each magazine returned. At times, however, PDC simply accepted an affidavit from the wholesaler as to the number of returns. PDC would then furnish petitioner, at 10-day or 1-week intervals, with reports of returns of unsold copies with respect to each magazine. During all of the taxable years in issue, petitioner consistently reflected on its books and on its Federal income tax returns income from its newsstand sales as a net amount. Petitioner accrued the aggregate sales price of the magazines it shipped during each respective taxable year as gross income *578 for that taxable year. Petitioner also accrued as a deduction its estimate of the number of magazines shipped that it anticipated ultimately would be returned to it. [3]
In his notice of deficiency, respondent disallowed petitioner's claimed deductions for estimated returns of unsold magazines. Respondent's disallowance was based upon his determination that petitioner was not entitled to a reduction in income for the anticipated return of publications which were not actually returned until the subsequent year. OPINION Issue One: Sale or Return vs. Consignment
In order to determined the amount petitioner must include in income from its sales of magazines, we must characterize the nature of the contracts executed between petitioner and PDC that were in effect during the taxable years in issue. Specifically, the issue is whether the contracts were contracts of sale with the right of PDC to return the unsold magazines (i.e., sale or return *579 contracts), or consignment contracts that created an agency in PDC to sell magazines for petitioner. Petitioner contends that they were consignment contracts and not contracts of sale. As a result, petitioner maintains that income accrued when the magazines were actually sold by retail newsstands and not when the magazines were shipped to the wholesalers. The characterization of the contract between petitioner and PDC is determined from the intention of the parties at the time that the respective contracts were executed. [4] *580 Lipsky v. Commonwealth United Corp.,551 F.2d 887, 896 (2d Cir. 1976); Ross v. H. Michaelyan, Inc.,57 F.2d 674, 675 (2d Cir. 1932); OilTrading Associates, Inc. v. Texas City Refining, Inc.,201 F.Supp. 846, 849 (S.D.N.Y. 1962). Our examination of the three contracts in evidence [5] convinces us that the parties intended to enter into sale or return contracts and not consignment contracts. The March 18, 1971 and November 14, 1973 contracts each set out in unambiguous language that -- [t]his contract shall be construed to effect a consummated sale to Distributor of copies shipped F.O.B. to Distributor's consignees, subject only to the provisions hereof. Publisher and Distributor shall be creditor and debtor hereunder, respectively. No provision hereof shall be construed to constitute or appoint Distributor or its consignees as Publisher's agent.[6] [Emphasis added.] Furthermore, Lawrence Manheimer, who was president and chairman of the board of PDC during the years 1972 to 1975, testified that, with respect to the March 18, 1971 and November 14, 1973 distribution contracts, PDC did not want to be petitioner's agent. [7] *581 The manner in which petitioner treated its transactions with PDC supports our finding that these were sale or return contracts. At the time petitioner shipped its magazines to the wholesalers, or shortly thereafter, petitioner sent an invoice to PDC reflecting the gross sales price to PDC of such magazines shipped and accrued in income the amount of the gross sales price. Had petitioner been operating on a consignment basis, it would have reported income when the retailer sold the magazines. Moreover, if petitioner had been operating on a consignment basis, it would have had to include all consigned magazines in its ending inventory. Sec. 1.471-1, Income Tax Regs.[8] *582 Petitioner failed to do this. [9] Finally, under the Uniform Commercial Code, as adopted by New York law, petitioner unquestionably operated under a "sale or return," as opposed to a consignment basis. N.Y. U.C.C. sections 2-326, 2-327 (McKinney 1964). [10]
We note that petitioner simply has not established that an agency relationship existed under each contract, rather than a sale. Neither PDC, the wholesalers nor the retailers were known to be substantially engaged in the sale of goods of others. Even though petitioner determined the resale prices at which the retailers would sell its magazines, this does not prove that each merchant was acting as an agent of petitioner *583 under a consignment contract. [11]
Petitioner contends that the agreements entered into with PDC were consignment contracts and cites Handfield v. Commissioner,23 T.C. 633 (1955), as support for its contention. In Handfield, the taxpayer, a nonresident Canadian individual, manufactured post cards. He had a contract with the American News Company whereby the latter distributed his cards to newsstands in the United States for sale to the public. The principal issue was whether the taxpayer was engaged in business in the United States. In deciding this issue, the Court first determined the nature of the contractual arrangement between the taxpayer and the news company. The Court analyzed the contract, which was embodied in a letter, and found that the taxpayer sold its products on a consignment basis. Its holding was based primarily upon the following factors: (1) The distributor was not obligated to buy any definite amount of merchandise from the taxpayer and was obligated to account only for merchandise which had been sold, (2) All unsold merchandise could be returned, [12]
(3) The taxpayer bore all transportation costs, *584 (4) The taxpayer gave full credit for all post cards sold regardless of their condition, (5) The distribution agreement controlled the retail price, and (6) The distributor had the right to discontinue selling the cards when sales were slow. [12]
See Handfield v. Commissioner,supra at 637. Upon close examination, Handfield is distinguishable from the instant case. The record in Handfield was extremely meager as the Court had only the contract between the taxpayer and American News Company and a few stipulated facts from which to determine the nature of the arrangement. In addition, the contract was silent with respect to whether or not a completed sale or consignment had taken place. In contrast, we had a full record before us in determining the nature of the contracts. Each of the contracts set forth in clear and unambiguous language that it effected a consummated sale to PDC of magazines shipped to PDC's consignees and that neither PDC nor its consignees were agents of petitioner. Moreover, the president of PDC testified that PDC did not intend to be petitioner's agent. Finally, the *585 evidence demonstrated that petitioner treated its transactions with PDC on a sale or return basis, not on a consignment basis. Having determined that petitioner made a sale of each shipment of magazines under a sale or return contract, we next must determine the amount of income that petitioner must include in its gross income during each of the taxable years in issue. Issue Two: Accrual of Income
Generally, under the accrual method of accounting, income is included in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Spring City Foundry Co. v. Commissioner,292 U.S. 182, 184-185 (1934); secs. 1.446-1(c)(1)(ii), 1.451-1(a), Income Tax Regs. Under a sale or return contract, petitioner is required to report the income from the sale of merchandise upon delivery of such merchandise to its customers. Record Wide Distributors, Inc. v. Commissioner,682 F.2d 204, 206 (8th Cir. 1982), affg. a Memorandum Opinion of this Court. [13]It is the right to receive payment, not the actual receipt, that determines whether income has accrued and must be includable in the gross income of an accrual *586 basis taxpayer. Commissioner v. Hansen,360 U.S. 446, 464 (1959); Spring City Foundry Co. v. Commissioner,supra at 184. Subsequent uncollectibility of the accrued sales income does not prevent its inclusion in gross income. See Spring City Foundry Co. v. Commissioner,supra at 185, which stated, "[i]f such accounts receivable become uncollectible, in whole or part, the question is one of reduction which may be taken according to the applicable statute." [14] *587 Facts similar to the instant case also were present in Record Wide Distributors, Inc. v. Commissioner,supra. In that case, the taxpayer was in the business of selling phonograph records, 8-track tapes, and cassette tapes to wholesalers and retailers. At the time the taxpayer shipped goods to a customer, an invoice also was sent showing the amount, description, and price of the items sold. The taxpayer guaranteed to its customers that they could return any unsold items for full credit. The taxpayer also did not require any payment for records and tapes until its customers had sold all the products it could and then returned the unsold merchandise. One of the issues presented was the proper tax treatment of the sale of goods under the accrual method of accounting. With respect to this issue, the Eighth Circuit found that the taxpayer, who dealt with its customers on a "sale or return" basis, had to include in income the invoice amounts upon delivery of the merchandise. [15] Accordingly, we find that the gross sales price of the magazines shipped accrued *588 as income to petitioner at the time of shipment. Issue Three: Deduction for Anticipated Returns
The next issue that we must decide is whether petitioner properly took a deduction for magazines that it anticipated would be returned to it by PDC. Petitioner argues that its method of accounting clearly reflected income because it was in accordance with generally accepted accounting principles and followed the general industry practice. Thus, it maintains that respondent improperly disallowed its claimed deductions. *589 Petitioner also contends that its accrual of deductions for estimated returns was proper because it satisfied the requirements of sections 446[16] and 461. This is, by far, the most difficult issue we must resolve. Accounting for sales and returns of magazines is governed by sections 446 and 461. Section 446(a) provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(b) provides, however, that if the method used by the taxpayer "does not clearly reflect income, the computation of taxable income shall be made under such methods as, in the opinion of the [Commissioner], does clearly reflect income." The Commissioner's power to determine whether the accounting method used by a taxpayer clearly reflects income is broad. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 533 (1979); Commissioner v. Hansen,360 U.S. 446, 467 (1959). Just because a method of accounting employed by a taxpayer is in accord with generally *590 accepted accounting principles [17] and practices does not mean that for income tax purposes it so clearly reflects income as to be binding on the Commissioner. American Automobile Assn. v. United States,367 U.S. 687, 693 (1961). This is particularly true when a taxpayer seeks to deduct an estimated reserve because financial accounting, which has as its purpose the providing of information with respect to a company's financial condition, "is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty." Thor Power Tool Co. v. Commissioner,supra at 543-544. Accordingly, whether petitioner properly deducted as an expense its estimate of anticipated returns to it by PDC depends upon whether the requirements of section 461 were met. Section 461(a) states the general rule that a taxpayer is allowed a deduction in "the *591 taxable year which is the proper taxable year under the method of accounting used in computing taxable income." For purposes of determining that "proper taxable year," section 1.461-1(a)(2), Income Tax Regs., sets forth what has become known as the "all-events" test [18] and provides in part as follows: Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * * The "all-events" test presents two hurdles that petitioner *592 must satisfy before it properly can take a deduction for anticipated returns of magazines. First, petitioner must establish that all events that determine the fact of liability must have occurred as of the end of the year for which it seeks to accrue the liability. This requirement prevents the deduction of an expenditure that might never be made. Second, as of the end of the year for which petitioner seeks to accrue the liability, petitioner must be able to estimate with reasonable accuracy the amount of the expenditure to be made in the subsequent year. See Burlington Northern Railroad Co. v. Commissioner,82 T.C. 143, 147 (1984); Ohio River Collieries Co. v. Commissioner,77 T.C. 1369, 1372-1373 (1981). Failure to satisfy either requirement of this two-prong test would be fatal to petitioner's claim. With respect to the first prong of the "all-events" test, petitioner contends that, under its distribution agreements, its liability to accept, and allow credits for, refunds of unsold magazines was fixed and unconditional as of the time it shipped magazines to PDC's wholesalers. Under the March 18, 1971 and November 14, 1973 distribution agreements executed between petitioner and *593 PDC, petitioner agreed "to credit [PDC] for returns of all unsold copies [of magazines] evidenced by full copies, or front covers, or headings, or wholesaler affidavits * * *." [19] Furthermore, PDC was required to obtain from each wholesaler evidence of returns, either in the form of magazine covers or affidavits, and it also was required to notify petitioner of returns on a frequent basis (generally every 10 days). [20] These services performed by PDC were an integral part of its relationship with petitioner. Thus, it is clear that notification of unsold magazines was a condition precedent to petitioner's liability to credit PDC for unsold magazines. The fact that unsold magazines typically were returned to petitioner does not change the fact that, in the absence of such return, petitioner was under no obligation to extend credit to PDC. Thus, from the time of shipment until such notification of unsold magazines was received by petitioner, its liability to PDC was contingent, not fixed. We note that our situation is substantially similar to the facts in Ertegun v. Commissioner,531 F.2d 1156 (2d Cir. 1976), *594 affg. a Memorandum Opinion of this Court. [21] In Ertegun, the taxpayer was a wholesaler of records and sold merchandise to approximately 60 distributors. Under the terms of sale, 41 of these distributors had a right to return unsold records to the taxpayer after the end of each calendar quarter and receive a credit from the taxpayer. The invoice on the sales of records stated that no merchandise was returnable "without written authorization from this office." The authorization for the return of the records was then issued, generally within 2 to 3 weeks after the end of the quarter. These distributors were guaranteed that unsold merchandise would be accepted by the taxpayer, up to an amount equal to 10 percent of the distributor's purchases from the taxpayer in the quarter which had just ended. In preparing its tax return, the taxpayer reduced its gross income by the amount of credit that the taxpayer anticipated it would have to extend for records sold during the last quarter of its taxable year, but which were to be returned in the subsequent taxable year. Respondent disallowed the deduction on the basis that the taxpayer's liability *595 for such allowance was contingent as of the end of its taxable year. The taxpayer argued that its anticipated 10-percent credit could be accounted for at the time the records were sold because its credit policy, in practice, amounted to an expected automatic 10-percent liability for each record it sold during the last quarter of its taxable year. Hence, the taxpayer maintained that, as of the end of its taxable year, its liability for returns was fixed and certain so that it was entitled to accrue the deduction. The Second Circuit found that the agreement between the taxpayer and its distributors was a sales contract with an option to return unsold merchandise, and that the taxpayer's credit liability was not incurred until the time that the unsold merchandise actually was returned. Petitioner argues that Ertegun is distinguishable from the instant case. It maintains that the taxpayer in Ertegun required the actual returns of records for the allowance of credits because such returns reduced its royalty obligations to its recording artists. Since the taxpayer derived an economic benefit from the return of unsold records by the distributors, such returns were not "ministerial" acts. *596 In contrast, petitioner insists that it derived no such economic benefit from the return of its unsold magazines. Since those returns did not result in any reduction of petitioner's costs, and were in fact later destroyed, petitioner contends that its requirement that it be notified of unsold magazines was merely a ministerial act. We disagree. Petitioner required notification of unsold magazines as a condition precedent to its granting PDC credit. This requirement served a substantial function because it enabled petitioner to insure that it was giving PDC credit only for unsold magazines. Thus, petitioner clearly derived an economic benefit from its receipt of notification of unsold magazines before giving PDC credit. Petitioner further argues that Ertegun is distinguishable from the instant case because in Ertegun the sales invoices used by the taxpayer expressly provided that no merchandise could be returned without prior written authorization. Since these return authorizations were not granted until after the close of the taxable year in issue, petitioner maintains that the taxpayer did not have a fixed liability to accept, and allow credits for, returns of unsold records *597 at the time of shipment. We fail to see how the requirement in Ertegun that written authorization be obtained before credit would be extended is different in substance from the requirement in the instant case that notification of unsold magazines be received by petitioner as a condition to it granting PDC credit. The fact that the requirement in Ertegun was expressly stated, whereas in the instant case the requirement was implicit in the contract, does not warrant that the two requirements be treated differently. Rather, we think that these two requirements are substantially similar in nature and support our finding that petitioner's liability to PDC for unsold magazines was not fixed until notification of unsold magazines was received by petitioner. Having failed the first prong of the "all-events" test, we need not address the second prong of the "all-events" test.Accordingly, no accrual for anticipated returns of unsold magazines is permitted as it is well established that a reserve for future or contingent liabilities cannot be deducted. [22] *598 Lucas v. American Code Company,280 U.S. 445, 452 (1930). We note that petitioner relied heavily upon Gillis v. United States,402 F.2d 501 (5th Cir. 1968), as support for its contention that it properly took a deduction for magazines that it anticipated would be returned to it by PDC.In Gillis, the taxpayer was a cotton merchant subject to the regulations of the Commodity Credit Corporation (hereinafter CCC). Under certain of these regulations designed to reduce stockpiles of domestic cotton, [23] *600 the taxpayer could obtain cotton from the CCC at a discount from the higher domestic price if it agreed to export the same amount of cotton within a certain period of time. The agreement *599 was backed up by a cash bond in the amount of the difference between the foreign and domestic price of cotton. The bond would be forfeited if the taxpayer either did not sell and export the cotton at the lower foreign price, or buy more cotton at the higher domestic price and export that cotton. The taxpayer deducted the amount of the bond as an accrued expense for the year in which it purchased the cotton, although it did not complete the transaction by exporting the required amount of cotton until the following year. In addition, the taxpayer sold cotton to a foreign corporation pursuant to a contract. Under the contract, the foreign corporation would submit claims to arbitration against the taxpayer if any cotton sold did not conform to the stated specifications. The taxpayer knew, at the time of some shipments, that certain cotton was of substandard quality. Since the taxpayer acknowledged that it was liable for such shipments of inferior cotton, it deducted as an accrued expense its estimate of the amount of the foreign corporation's anticipated claims that were to be submitted. The Court in Gillis found that the bond expense was properly deductible as an accrued expense, since the taxpayer was committed to a fixed obligation in a known amount at the time he entered into a purchase agreement with the CCC. Thus, all the events had occurred which fixed the nature and amount of the taxpayer's obligations. The Court also held that the taxpayer properly deducted its anticipated claims by the foreign corporation as an accrued liability. Since the taxpayer knew, at the time of shipment, that certain cotton was substandard and that claims would be made against it as a result, the Court found that the taxpayer's liability was fixed under the contract at the time of shipment. Petitioner's reliance on Gillis is misplaced. In that case, the taxpayer knew at the time the cotton was shipped that the cotton was inferior, so that its liability was fixed and certain at the time such cotton was shipped. By contrast, there was no absolute certainty that any of the magazines shipped by petitioner to wholesalers would ultimately be returned as unsold for credit. Thus, at the time of shipment, petitioner's liability was not fixed. Even if we agreed with petitioner's *601 contention that some of the magazines shipped by it to wholesalers were virtually certain to be returned, that still falls short of the absolute certainty required in order for a liability to be fixed, and not contingent. Petitioner's reliance on Pacific Grape Products Co. v. Commissioner,219 F.2d 862 (9th Cir. 1955), revg. and remanding 17 T.C. 1097 (1952), is equally misplaced. In Pacific Grape Products Co., the taxpayer was a canner of Fruits and fruit products and, through brokers, sold its products to wholesalers. The taxpayer treated the brokerage fees relating to the goods that were sold and billed, but undelivered as of the end of each taxable year, as deductible expenses in their respective years. In denying this deduction, the Commissioner argued that the taxpayer's liability for brokerage fees did not become fixed until the year in which the goods were paid. At trial, the taxpayer introduced evidence that, with respect to the customary practice of the California Canning Industry, the liability for brokerage fees became fixed when the goods were billed. The taxpayer, however, failed to introduce evidence of its agreements with its brokers. The Tax Court found that the *602 taxpayer failed to carry its burden of proving that the Commissioner's determination was erroneous, noting that the taxpayer's failure to produce the agreements was fatal to its case. Accordingly, the Tax Court upheld the Commissioner's determination. On appeal, the Ninth Circuit reversed us. It found that the taxpayer's introduction of evidence with respect to the California industry practice was sufficient to demonstrate that its liability for brokerage fees was fixed at the time when the goods were billed. Pacific Grape Products Co. is distinguishable because, in the instant case, the agreements between petitioner and PDC were introduced into evidence. Thus, it is unnecessary to look to the customary practices of the publishing industry to determine when petitioner's liability to PDC for returns of unsold magazines became fixed. Furthermore, the evidence revealed that this liability was contingent at the time of shipment and that it became fixed only upon the subsequent notification of unsold magazines. [24] *603 To summarize, we find that petitioner must accrue as income, at the time of shipment, the gross sales price of magazines shipped. However, with respect to returns of unsold magazines, petitioner must wait until notification of such returns before it properly can accrue a deduction for this expense. [25] Petitioner maintains that our finding has the effect of mismatching items of income and expense, and thus, fails to clearly reflect income under an accrual method of accounting. Such contention is without merit. The "matching" principle does not overcome the requirements of the "all-events" test for the recognition of income and deductions. [26] See American Automobile Assn. v. United States,367 U.S. 687 (1961) (the taxpayer was not allowed to allocate prepaid income over the months during which services would be provided and expenses incurred); World Airways, Inc. v. Commissioner,564 F.2d 886 (9th Cir. 1977), affg. 62 T.C. 786 (1974) (the taxpayer was not allowed to allocate the reasonably foreseeable cost of statutorily mandated airplane repairs to the *604 periods in which plane mileage, and revenues, were accumulated).
Decision will be entered under Rule 155.
Footnotes
1. A substantial number of copies of each issue of petitioner's magazines were returned by the final settlement date. If, however, returns were made or reported after the final settlement date, petitioner accepted and paid PDC for such returns.↩
2. The settlement date, however, was moved from 70 to 90 days from off sale. Also, PDC was required to submit return statements every 7 days instead of every 10 days.↩
3. During the taxable years in issue, petitioner's estimates of returns exceeded actual returns. The cummulative amount by which its estimated returns exceeded actual returns totaled $505,445, and petitioner failed to reflect this amount in its gross income.↩
4. Although petitioner's place of business was in California, the contracts stated that they were to be construed in accordance with the laws of New York. In any event, we note that California law is in accord with New York law on this point. Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.,69 Cal. 2d 33, 69 Cal. Rptr. 561, 564 n.5, 442 P.2d 641, 644 n.5 (1968); see also Cal. Civ. Code section 1636↩ (West 1985). 5. The parties stipulated that these contracts were representative of all such contracts entered into between petitioner and PDC during the years in issue. ↩
6. The April 9, 1976 contract had a similarly worded clause. ↩
7. Since Mr. Manheimer was not president when the April 9, 1976 contract was entered into, he could not testify with respect to that particular contract. Nothing in the record, however, indicated that PDC desired to be petitioner's agent at that later date.
8. Sec. 1.471-1, Income Tax Regs., specifically requires that "[m]erchandise should be included in the inventory only if title thereto is vested in the taxpayers * * * but should exclude from inventory goods sold * * * title to which has passed to the purchaser." 9. For all the taxable years in issue, petitioner's income tax returns indicated that it did not have any inventory on hand at the end of its taxable year. ↩
10. N.Y.U.C.C., section 2-326(1)(b) provides that "[u]nless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is a 'sale or return' if the goods are delivered primarily for resale"; and section 2-327(2)(a)↩ provides that "[u]nder a sale or return unless otherwise agreed the option to return extends to the whole or any commercial unit of the goods while in substantially their original condition * * *."
11. See J.J. Little & Ives Co. v. Commissioner,T.C. Memo. 1966-68↩.
12. It should be mentioned that factors (2) and (6) are also present in a sale or return contract.↩
13. Record Wide Distributors, Inc. v. Commissioner,T.C. Memo. 1981-12. See also J.J. Little & Ives Co. v. Commissioner,T.C. Memo. 1966-68; Scott Krauss News Agency, Inc. v. Commissioner,T.C. Memo. 1964-171↩. 14. Under sec. 458 (effective only for taxable years beginning after September 30, 1979) an accrual basis distributor of magazines may elect to exclude from gross income the income attributable to magazines returned within 2 months and 15 days after the close of the taxable year in which the sales were made. Although not effective for the taxable years in issue, the legislative history indicates that under pre-section 458 law petitioner is required to include the income from the sale of magazines in gross income when they are shipped to PDC's wholesalers, irrespective of the number of returns. H. Rept. No. 95-1800 (Conf.), 1978-3 C.B. (Vol. 1) 521 (1978).
15. We note that petitioner argues that, because of its return policy, all events had not occurred at the time of shipment which established its right to receive any certain amount of income. In maintains that its right to receive income occurred at the off-sale date because it was then that the actual number of magazines sold for which petitioner was entitled to payment were determined. This argument was raised and rejected in Record Wide Distributors, Inc. v. Commissioner,682 F.2d 204, 206↩ (8th Cir. 1982), affg. a Memorandum Opinion of this Court, as it found that the taxpayer was confusing the uncertainty of the time and actual payment with the right to receive payment.
16. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
17. We note that from the record it is not entirely clear that petitioner's method of accounting was in accordance with generally accepted accounting principles. Specifically, petitioner failed to reflect in income the amount of its estimated returns that exceeded actual returns.↩
18. The "all-events" test was first enunciated by the Supreme Court in United States v. Anderson,269 U.S. 422, 440-441 (1926). See Nightingale v. United States,684 F.2d 611, 614-615 (9th Cir. 1982); Burlington Northern Railroad Co. v. Commissioner,82 T.C. 143, 146↩ (1984).
19. The April 9, 1976 contract was similarly worded. ↩
20. See findings of fact at pages 3-5.↩
21. Ertegun v. Commissioner,T.C. Memo. 1975-27↩.
22. As part of the 1954 Code, Congress enacted sec. 462 which permitted taxpayers to deduct reserves for estimated expenses. The principal requirement of the statute was that the estimated expense be attributable to the income of the taxable year and that Treasury was satisfied that the amount of the expense could be estimated with reasonable accuracy. Upon further reflection, however, Congress realized that Treasury would suffer substantial losses as a result of taxpayers switching to the reserve method in the transition year. As a consequence, sec. 462 was repealed retroactively in 1955 by the Act of June 15, 1955, ch. 143, 68 A Stat. 158.
23. The stockpiles existed because the price of domestic cotton was higher than the price of foreign cotton.
24. Likewise, petitioner's reliance on Crescent Wharf & Warehouse Co. v. Commissioner,518 F.2d 772 (9th Cir. 1975) and Burlington Northern Railroad Co. v. Commissioner,82 T.C. 143 (1984), is misplaced. Those cases involved fixed statutory liabilities, whereas the instant case involves estimates of possible liabilities.
25. We note that this Court has consistently held that an accrual for anticipated returns in this situation is not allowable, either as an offset against gross sales or as a deduction from gross income. See J.J. Little & Ives Co. v. Commissioner,T.C. Memo. 1966-68; Scott Krauss News Agency, Inc. v. Commissioner,T.C. Memo. 1964-171↩. 26. Petitioner cited numerous cases in support of its contention that the "matching" of items of income and expense is necessary in order for an accrual method of accounting to clearly reflect income. All of these cases relied upon by petitioner are inapposite because in all of those cases the "all-events" test was found, either expressly or impliedly, to have been satisfied.↩