T.C. Memo. 2020-142

UNITED STATES TAX COURT

THE MORNING STAR PACKING COMPANY, L.P., THE MORNING STAR
COMPANY, TAX MATTERS PARTNER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5013-15,   5015-15,          Filed October 14, 2020.
        16684-16, 16842-16.

Robert R. Rubin, Brian P. Bowen, and Matthew D. Carlson, for petitioners.

Annie Lee and Julie Ann Fields, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith:  Liberty
Packing Company, LLC, The Morning Star Company, Tax Matters Partner, docket
Nos. 5015-15 and 16842-16; and The Morning Star Packing Company, L.P., The
Morning Star Company, Tax Matters Partner, docket No. 16684-16.

[*2]                              MEMORANDUM OPINION

COHEN, Judge:  In notices of final partnership administrative adjustment (FPAA) for years 2008, 2009, 2010 and 2011 (years in issue), respondent determined that The Morning Star Packing Co., L.P. (TMSPC), and Liberty Packing Co., LLC (LPC) (collectively, partnerships), were not entitled to increase their costs of goods sold (COGS) for the costs to restore, rebuild, recondition, and retest their manufacturing facilities.  These cases were fully stipulated and submitted to the Court under Rule 122.  The stipulations and the simultaneous briefs of the parties were well crafted, and the uncontested findings are sufficient to reach our conclusions.  There is no issue as to burden of proof.  As a result, our legal analysis set forth in the discussion portion below is concise.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are whether the 2008-11 accrued production costs were:  (1) fixed and binding where economic performance did not occur until the year following the tax year claimed for and (2) whether the partnerships' inclusion of such production costs in COGS for the years in issue

**[*3]** resulted in a more proper match against income than inclusion in the taxable year in which economic performance occurred under the section 461(h)(3) recurring items exception to the all events test.

Background

All of the facts have been stipulated, and the stipulated facts are incorporated as our findings by this reference. Respondent objected to paragraphs and exhibits relating to prior audits of TMSPC and a related entity that resulted in no adjustments. There are no penalty issues relating to the disputed adjustments. Respondent's relevancy objections are sustained, and those paragraphs and exhibits are not considered in our opinion. See generally Auto. Club of Mich. v. Commissioner, 353 U.S. 180 (1957).

At the time the petitions were filed the principal place of business of both partnerships was in Woodland, California. TMSPC is a limited partnership and LPC is a limited liability company. Both are taxed as partnerships. Both used the accrual method of accounting, and their financial accounting fiscal years end on June 30. Each has a calendar yearend for tax purposes because it is required to have the same yearend as its majority interest partner.

**[*4]** The partnerships provide bulk-packaged tomato products to food processors and customer-branded finished products to the food service and retail trades. They account for about 25% of the California processing tomato production, supplying 40% of the United States ingredient tomato paste and diced tomato markets.

Production Process

The annual growing cycle for tomato farmers begins approximately in October when fields are prepared. Generally farmers purchase tomato seeds in December. It is common for the partnerships and farmers to have oral agreements for the purchase of fresh tomatoes by December, with written agreements to follow. Oral agreements between farmers and processors, such as the partnerships, are customary in California. About 85% of tomato plants are planted in hot houses and then transplanted to the fields. In or around June and July farmers harvest the tomatoes from the fields and deliver them to the partnerships. Freshly harvested tomatoes have a shelf life measured in days and need to be processed quickly. The partnerships' three manufacturing facilities operate 24 hours per day from approximately July to October, about 100 days per year, during the tomato harvest period.

When the fresh tomatoes arrive at a facility, they move from a truck into the facility through a tomato flume to sorting tables, choppers, and hot break tanks.

[*5] At this point the product is in an airtight, closed, sterile environment. If there are any air leaks, dirt is sucked into the environment, which reactivates the germs and bacteria in the product, resulting in a loss of sterility that necessitates shutting down the production line. The product is propelled by a series of powerful pumps through holding tanks, finishers, multistage evaporators, and a FranRica flash cooler to FranRica fillers that package the product in sterile 300-gallon boxes and 55-gallon-drum containers for shipment.

Heat is a very important element in the evaporation process. The heat is provided by large natural gas boilers that produce high-pressure steam. The boilers are subject to stringent emission rules and regulations.

Food processing facilities that are operated year round are typically multiline facilities with built-in redundancies. If any one part of a processing line fails, the entire processing line must cease operation because of a loss of sterility. In facilities that operate year round the other processing lines are able to compensate. The partnerships' facilities are single-line plants with no redundancy. If any one part of the processing line fails, the entire facility ceases production. If a facility is not operable for more than a few hours during a season and the fresh tomatoes cannot be processed because of spoilage, the partnerships are obligated to pay the farmers the contract price for the tomatoes. The partnerships would also

[*6] be liable for damages to its customers for failure to provide the promised tomato paste. For some customers the amount of damages could be very large because the customer might have to wait until the next growing season for tomato paste. The resulting payments for the farmer's and customer's damages could be catastrophic for the partnerships.

The partnerships generally have two types of customers: (1) bill and hold customers, which account for approximately 30% of sales, and (2) regular customers, which account for approximately 70% of sales. Bill and hold customers have contracts pursuant to which each pays an estimated cost before production for a stated amount of product. Upon completion of production of the product, title is transferred to the customer; the product is stored at the partnerships' sites and shipped at the request of the customer, generally between August and July of the following year. (For example, tomato paste produced during 2008 is generally delivered between August 2008 and July 2009.) The partnerships typically enter into multiyear production agreements with bill and hold customers. Regular customers may order product at any time. Once such an order is placed, title to the product is transferred to the customer, removing it from inventory, and shipped. Generally, inventory is totally depleted by July of the year

**[\*7]** following production.  (For example, tomato paste produced in 2008 is generally sold by July 2009.)

The partnerships' customers generally require that the tomato products produced meet certain quality and sanitary specifications.  Many of the partnerships' customers require independent testing to assure sterility and quality.  Because the partnerships contract to supply tomato paste to the U.S. Department of Agriculture (USDA), their facilities must pass USDA inspections for safety, sterility, and quality.  The U.S. Food and Drug Administration and the State of California Department of Public Health also inspect the facilities.

Credit Agreements

During the years in issue the partnerships entered into several credit agreements with Wells Fargo Bank, U.S. Bank, and Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. "Rabobank International" (lenders).  On May 21, 2007, the partnerships executed a third amended and restated credit agreement (third credit agreement) with the lenders.  Under the terms of this agreement, the lenders agreed to provide credit facilities including revolving loans, letters of credit, and swing line loans (credit facilities) to the partnerships for the partnerships' general business purposes and working capital.  The lenders

**[\*8]** made funds available to the partnerships by the May 31, 2007, closing date, and the agreement had a maturity date of June 30, 2009.

The third credit agreement included the following provisions:

ARTICLE V.       <u>COVENANTS.</u>

SECTION 5.01.    <u>Affirmative Covenants</u>.  Until the termination of this Agreement and the satisfaction in full by the Borrowers of the Obligations, each Borrower will comply, and will cause compliance by its respective Subsidiaries, with the following affirmative covenants, unless the Required Lenders shall otherwise consent in writing:

*        *        *        *        *        *        *

(d) <u>Existence, Compliance</u>.   Each Borrower and its respective Subsidiaries shall (i) <u>maintain all material licenses, Permits, governmental approvals, rights, privileges and franchises reasonably necessary for the conduct of its business</u>, (ii) conduct its business in an orderly and regular manner, and (iii) comply with the provisions of all documents pursuant to which such Borrower is organized and/or which govern such Borrower's continued existence and with all Governmental Rules.  [Emphasis added.]

(e) <u>General Business Operations</u>.  Each Borrower and its respective Subsidiaries shall (i) preserve and maintain its business existence and all of its rights, privileges and franchises reasonably necessary to the conduct of its business, <u>(ii) conduct its business activities in compliance with all laws and material contractual obligations applicable to such Person</u>, <u>and</u> <u>(iii) keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted</u>, except, in each case, where any failure is not reasonably likely to have a Material Adverse Effect. * * * [Emphasis added.]

**[*9]**     *       *       *       *       *       *       *

ARTICLE VI. <u>DEFAULT.</u>

SECTION 6.01.     <u>Events Of Default</u>. The occurrence or existence of any one or more of the following shall constitute an "<u>Event of Default</u>" hereunder:

*       *       *       *       *       *       *

(d) <u>Other Defaults</u>. Either Borrower defaults in the performance of or compliance with any obligation, agreement or other provision contained herein (other than those referred to in subsections (a), (b) or (c) above), and, such default shall continue for a period of twenty (20) days following written notice to Borrowing Agent on behalf of such Borrower of such default[.]

*       *       *       *       *       *       *

SECTION 6.02.     <u>Remedies</u>. <u>At any time after the occurrence and during the continuance of any Event of Default</u> (other than an Event of Default referred to in Section 6.01(g) or 6.01(h)), <u>Agent may, with the consent of the Required Lenders, or shall, upon instructions from the Required Lenders, by written notice to Borrowing Agent on behalf of each Borrower</u>, (a) terminate the Commitments and the obligations of the Lenders to make Loans or issue Letters of Credit, (b) declare all outstanding Obligations payable by the Borrowers to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Notes to the contrary notwithstanding, and/or (c) direct each Borrower which has one or more Letters of Credit issued for its account outstanding to deliver funds to Agent in an amount equal to the aggregate stated amount of all outstanding Letters of Credit issued for the account of such Borrower. * * * In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, Agent may exercise any other right, power or remedy available to it

[*10] under any of the Credit Documents or otherwise by law, either by suit in equity or by action at law, or both. [Emphasis added.]

On August 28, 2008, the partnerships executed a fourth amended and restated credit agreement (fourth credit agreement) with the lenders. The fourth credit agreement extended the credit facilities available to the partnerships through June 30, 2010, and included identical text regarding covenants, default, and remedies. The partnerships entered into several subsequent agreements with the lenders that adopted the terms of the fourth credit agreement and further extended the credit facilities available to them through June 1, 2011. The amount of credit available to the partnerships during the years in issue pursuant to these collective credit agreements ranged between $260 million and $90 million.

Production Accrual Liabilities

The costs in issue are costs to restore, rebuild, and retest the manufacturing facilities for use during the next production cycle. The accrued production costs include amounts to be paid for goods and services. The partnerships maintain reserves that they refer to as "production accrual" (production accrual reserve accounts). These reserves are used to account for future costs associated with restoring, rebuilding, and retesting the manufacturing facilities for use during the next production cycle. The production accrual reserve accounts for both TMSPC

**[*11]** and LPC included:  amounts for production labor, boiler fuel, electricity, waste disposal, chemicals and lubrication, production supplies, repairs and maintenance, lease, production wages, and administration wages.

The accrued production costs were recurring, and the partnerships determined the amounts to be set aside in the reserves to cover these costs with reasonable accuracy.  The partnerships issue payroll checks every other Thursday for work performed for the two-week period ending the Saturday before payday. Thus, payroll was paid between 5 and 19 days after the services were performed. The partnerships generally paid accounts payable 30 days after the goods and services were provided.  For many reasons, including the sterility of the facilities when they are in operation, it is most efficient to delay some of the restoring, rebuilding, and retesting work until closer to the beginning of the next production cycle.  Except for a de minimis amount of goods and services provided and paid for by December 31, the goods and services are not provided or paid for until the next year.  Hence, economic performance of the production accrual liabilities does not occur until the next taxable year.

Partnerships' Accounting and Tax Reporting for 2008 Through 2011

The partnerships have consistently used the full absorption method of inventory accounting for all taxable years since each was founded.  Accordingly

[*12] the partnerships included as an addition to COGS the portion of the total accrued production costs equal to the percentage of the year's production which had been sold and recognized as income as of December 31. They apportioned the accrued production costs not included in COGS into ending inventory. They recognized income for inventory sold to both their bill and hold customers and regular customers when the partnerships transferred title for the products to each customer. The partnerships capitalized and depreciated all the costs to put each processing plant into operation. The partnerships included the accrued production costs in their audited financial statements for fiscal years ended June 30, 2008-12. These audited financial statements complied with generally accepted accounting principles (GAAP).

Both partnerships filed Forms 1065, U.S. Return of Partnership Income, in April for each year in issue. They reported the accrued production costs on their Forms 1065 for each year in issue.

Respondent's Determinations

In two FPAAs for years 2008 and 2009 and years 2010 and 2011 for each partnership, the Internal Revenue Service (IRS) determined that neither was entitled to increase its COGS for the amount of accrued production costs because: (1) the partnership had not shown that all events had occurred to establish the fact

[*13] of the liabilities and (2) economic performance had not occurred with respect to the liabilities to qualify for accrual for the years claimed. The IRS concluded that if the partnerships' financial accounting years ended on December 31 instead of June 30, their December 31 yearend financial statements would not comply with GAAP because the accrued production costs were included in COGS. The FPAAs showed the following adjustments:

| Year | Adjustment for TMSPC | Adjustment for LPC |
|------|------|------|
| 2008 | $4,650,061 | $4,060,538 |
| 2009 | 16,444 | (1,997,954) |
| 2010 | (97,479) | 176,943 |
| 2011 | (591,255) | 759,590 |

In respondent's opening brief, modifications to the original adjustments were conceded.

## Discussion

Respondent contends that the accrued production costs that the partnerships included in COGS for the years in issue were: (1) not fixed and binding until the following tax year when the partnerships began economic performance and (2) more properly matched against income for the taxable year in which economic

[*14] performance occurred under the section 461(h)(3) recurring items exception to the all events test. The partnerships disagree.

All Events Test

Section 461(a) provides that a deduction must be taken for the proper taxable year under the taxpayer's method of accounting. Generally, an accrual method taxpayer may deduct expenses for the years in which the taxpayer incurred the expenses, regardless of the actual payment dates. Sec. 461(h)(4); Caltex Oil Venture v. Commissioner, 138 T.C. 18, 23 (2012); sec. 1.461-1(a)(2), Income Tax Regs. The all events test governs whether a business expense has been incurred to permit its accrual for tax purposes. See Challenge Publ'ns, Inc. v. Commissioner, T.C. Memo. 1986-36, 1986 Tax Ct. Memo LEXIS 570, at *22, aff'd, 845 F.2d 1541 (9th Cir. 1988). Liability is incurred under the all events test if three factors are met: (1) all of the events that establish the fact of the liability must have occurred, (2) the amount must be able to be determined with reasonable accuracy, and (3) economic performance must have occurred. Sec. 461(h)(4); sec. 1.461-1(a)(2), Income Tax Regs.; sec. 1.461-4, Income Tax Regs. (explaining economic performance).

**[\*15]** The term "liability" refers to "any item allowable as a deduction, cost, or expense for Federal income tax purposes." Sec. 1.446-1(c)(1)(ii)(B), Income Tax Regs. Thus the production costs reflected in the partnerships' COGS come within this definition. To be deductible, a liability must be fixed, absolute, see Brown v. Helvering, 291 U.S. 193, 201 (1934), and unconditional, see Lucas v. N. Tex. Lumber Co., 281 U.S. 11, 13 (1930). A liability may not be deducted if it is contingent upon the occurrence of a future event. See Lucas v. Am. Code Co., 280 U.S. 445, 452 (1930). "Generally, the fact of a liability is established on the earlier of: (1) the event fixing the liability, such as the required performance or (2) the date the payment is unconditionally due." VECO Corp. & Subs. v. Commissioner, 141 T.C. 440, 461 (2013).

Respondent has conceded that the partnerships determined the accrued production costs with reasonable accuracy and that they complied with the economic performance requirement. However, respondent contends that the accrued production costs consisted of bilateral contracts for goods and services to recondition the partnerships' manufacturing facilities that were provided to and paid for by the partnerships after the December 31 close of their tax year. Respondent argues that all events had not occurred during the years in issue to establish the fact of the liabilities for the accrued production costs. The

[*16] partnerships contend that respondent's focus on the bilateral goods and services contracts is misplaced.  Instead the partnerships argue that their credit agreements and multiyear contracts to supply customers with tomato products obligated them to incur the accrued production costs to restore, rebuild, and retest the manufacturing facilities.  We agree with respondent.

We have long held that obligations created by separate contracts, statutes, or regulations may qualify as deductible liabilities for Federal income tax purposes. Exxon Mobil Corp. v. Commissioner, 114 T.C. 293, 318-319 (2000) (hydrocarbon leases); Ohio River Collieries Co. v. Commissioner, 77 T.C. 1369, 1370-1371 (1981) (State statute).  In such cases the contracts and statutes must clearly set forth the taxpayer's obligations so as to "provide a sufficiently fixed and definite basis on which to base the tax accruals sought".  Exxon Mobil Corp. v. Commissioner, 114 T.C. at 317-318 (concluding hydrocarbon lease that did not clearly set forth and establish taxpayer's obligations failed to meet first prong of all events test); see also Ohio River Collieries Co. v. Commissioner, 77 T.C. at 1370, 1375-1376 (ruling Ohio's comprehensive strip-mining reclamation statute that detailed requirements for refilling, grading, resoiling, and planting mined areas established fact of liability).

[*17] The credit agreements involved in these cases do not specifically set forth the partnerships' obligations to provide a comparably sufficiently fixed and definite basis. Instead the credit agreements include nonspecific text and generalized obligations. The agreements merely require that the partnerships "maintain all material licenses, Permits, [and] governmental approvals", comply with "all laws", and "keep all property useful and necessary in its business in good working order and condition". The credit agreements neither specify which laws or regulations must be complied with nor identify exactly which property must be kept in good working order. Accordingly, we conclude that the generalized obligations found in the credit agreements do not establish the fact of the partnerships' liabilities for the accrued production costs for the years in issue.

The partnerships alternatively assert that their multiyear production contracts with various customers establish the fact of their liabilities for the accrued production costs. While these production contracts involve extensive product quality specifications, the partnerships' efforts to comply with their customers' specifications are production-run specific. Such compliance necessarily takes place before and during the production run of tomato products for a given customer. The accrued production costs in issue were for goods and services provided after the production run in each year in issue. Furthermore, the

**[\*18]** parties have stipulated that the accrued production costs in issue are to restore, rebuild, and retest the manufacturing facilities for use during the next production cycle. We conclude that the partnerships' multiyear production contracts fail to establish the fact of the liabilities for the accrued production costs for the years in issue.

Because of our holding that the liabilities for the accrued production costs were not fixed in the years in issue, we need not address the partnerships' arguments regarding the recurring items exception under section 461(h).

We have considered all of the parties' arguments, and, to the extent not addressed above, we conclude that they are moot, irrelevant, or without merit. To reflect the foregoing, the stipulation of settled issues, and the modifications of adjustments conceded in respondent's briefs,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.